United States Court of Appeals,

Fifth Circuit.

No. 92-1446.

In the Matter of BRISCOE ENTERPRISES, LTD., II, d/b/a/ Regalridge Apartments, Debtor.

HEARTLAND FEDERAL SAVINGS & LOAN ASSOCIATION, Appellee,

v.

BRISCOE ENTERPRISES, LTD., II, d/b/a/ REGALRIDGE APARTMENTS, Appellant.

July 13, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before WISDOM and DUHÉ, Circuit Judges, and DOHERTY[*], District Judge.

WISDOM, Circuit Judge:

This bankruptcy case requires the Court to confront some very difficult problems associated with a Chapter 11 "cramdown" reorganization.[1] We agree with the Bankruptcy court's approval of the reorganization plan; we REVERSE the District Court.

I.

The debtor, Briscoe Enterprises, Ltd., II, is a Texas limited partnership formed to develop a 784-unit apartment complex in a depressed section of Fort Worth. It is a low-to-moderate-income community, and about 25% of the residents receive rental assistance from either the federal government or the city of Fort Worth. This complex, known as the Regalridge Square Apartments, was the sole asset of the limited partnership. Construction was in two phases. It was completed in early 1985. Financing was non-recourse and was from two sources: the predecessor of Heartland

---

[*]District Judge of the Western District of Louisiana, sitting by designation.

[1]"The cram down provision allows a [reorganization] plan to be confirmed even if the necessary consents of each class [of creditors] are not obtained. The policy is that the public good is served by rehabilitations and a law that prevents creditors from getting immediate satisfaction but gives the creditor as much as the creditor could get upon liquidation and compensates him or her for the delay is proper to force upon creditors." 3 Daniel R. Cowans et al., *Cowans Bankruptcy Law and Practice* § 20.26 at 419 (1989 edition).

Federal Savings and Loan Association and the city of Fort Worth.[2]  Heartland lent Briscoe $18.7 million.  The city which had a lien junior to that of Heartland lent $7 million.

When the free-wheeling real estate ride of the mid-eighties ground to a halt, Briscoe began to miss its interest payments.  Briscoe failed to make interest payments for the last three months of 1988 and entirely ceased servicing its debt to Heartland in July 1989.  On December 29, 1989, Briscoe sought relief under 11 U.S.C. § 1101 et seq. (Chapter 11).  Briscoe filed its first amended plan of reorganization on November 16, 1990 and its fourth on January 22, 1991.  The fourth plan is the subject of this case.

On January 23, 1991, the bankruptcy court began hearings to consider the confirmation of the plan.  The bankruptcy court held four days of hearings in January and one day in March.  Eight witnesses appeared.  The court, with counsel present, personally inspected the property.  During these hearings, the bankruptcy court assigned a value to the property of $8.2 million.  This was classified as a secured claim for Heartland.  Heartland's remaining $10 million[3] and the city's $7 million became unsecured claims.  Heartland objected, so that for the reorganization plan to be confirmed, it would have to pass the cramdown requirements of § 1129(b).  The bankruptcy judge confirmed the plan on April 23, 1991.

Heartland appealed to the district court.  The district court, without oral argument but in a lengthy opinion, reversed the bankruptcy court's confirmation on April 14, 1992.[4]  Briscoe then appealed to this Court.

## II.

The plan divides the claims and interests into six classes:

"Class 1 consists of Allowed Administrative Claims.

Class 2 consists of Allowed Priority Claims.

---

[2]The language of this opinion will treat Heartland as if it had made the initial loan.

[3]The bankruptcy court described Heartland's unsecured deficiency claim as "approximately $10 million".

[4]*In re Briscoe Enterprises Ltd., II,* 138 B.R. 795 (N.D.Tex.1992).

Class 3 consists of the Allowed City Claim.

Class 4 consists of the Allowed Heartland Claim.

Class 5 consists of all Allowed Unsecured Claims asserted against the Debtor.

Class 6 consists of holders of Interests in the Debtor."

The property is to be placed in a trust managed by three trustees. Heartland, the city, and the Fort Worth NAACP will each nominate a trustee. Heartland's claim was divided into a secured and an unsecured portion. The secured portion is to be paid in monthly installments of principal and interest as though amortized over thirty years with interest at a rate of 10.25%, the rate of interest in the loan. The secured claim is to be paid in full upon the sale of the property or the expiration of fifteen years, whichever shall first occur. At the end of fifteen years, 20% of the principal would be paid down. Heartland's unsecured claim is accorded the same treatment as the city's unsecured claim and the class 5 general unsecured creditors. These unsecured creditors are to receive periodic cash payments if net cash flow allows and the trustees determine that excess cash need not be reserved for any other purpose. The unsecured creditors would also benefit pro rata from any sale or refinancing of the property if there is an excess over Heartland's secured claim. The holders of class 6 interests will receive nothing and their interests are cancelled.[5]

III.

The bankruptcy appellate process makes this Court the second level of appellate review. This Court, however, performs the identical task as the district court. We review the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo.[6] We do benefit from the district court's thoughts on the matter, but as Judge Frank Johnson wrote for the Eleventh Circuit: "The amount of persuasive weight, if any, to be accorded the district court's conclusion ... is entirely subject to our discretion."[7]

---

[5]This appears to fulfill the requirements of § 1123(a)(3).

[6]*Matter of Bennett,* 970 F.2d 138, 139 (5th Cir.1992).

[7]*In Re Sublett,* 895 F.2d 1381, 1384 n. 5 (11th Cir.1990).

IV.[8]

A. *The Debtor's Standard of Proof.*

The first question that we need to resolve is the debtor's standard of proof in proving that the reorganization is confirmable under § 1129(a) and whether the fact that this is a § 1129(b) cramdown affects the standard.

The two options are proof by a preponderance of the evidence or by clear and convincing evidence. "Preponderance" means that it is more likely than not.[9] "Clear and convincing" is a higher standard and requires a high probability of success.[10]

A number of bankruptcy courts have used the clear and convincing standard in a cramdown, but in none of the cases have we found a satisfactory explanation why that is the appropriate standard.[11] A few hedge and state that the plan would fail under either standard.[12] This is exactly

---

[8]Professor Elizabeth Warren was consulted as an outside expert in compliance with (B)(7) of Canon 3 of the Code of Judicial Conduct for United States Judges which in pertinent part provides: "A judge may obtain the advice of a disinterested expert on the law applicable to the proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond."

Justice Roger Traynor ended an article on appellate judging with the comment that: "There is no reason why courts should not request in complicated cases the disinterested expert opinion of scholars ... We might well develop a tradition of regarding such public service as one of the most honorable responsibilities of the profession." Roger J. Traynor, *Badlands In An Appellate Judge's Realm of Reason,* 7 Utah L.Rev. 157, 170 (1960).

Professor Warren is the Warren A. Schnader Professor of Commercial Law at the University of Pennsylvania and Robert Braucher Visiting Professor of Law at Harvard. She is the co-author (with Prof. Westbrook) of *The Law of Debtors and Creditors* (Little Brown 2nd ed. 1992) and is preparing a handbook for the Federal Judicial Center on Business Bankruptcy.

[9]*See e.g. In re Winship,* 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368, 379 (1970) (Harlan, J. concurring).

[10]*See e.g. Aetna Insurance Co. v. Paddock,* 301 F.2d 807, 811 (5th Cir.1962).

[11]*See e.g. In re Mcorp Financial, Inc.,* 137 B.R. 219, 225 (Bkrtcy.S.D.Tex.1992) and cases cited therein.

[12]*See e.g. In re Rusty Jones, Inc.,* 110 B.R. 362, 373 (Bkrtcy.N.D.Ill.1990)

what the district court did in this case.[13]  As we view it, however, this is a case in which the plan would not pass a clear and convincing standard, but, as will be discussed below, it was not clearly erroneous for the bankruptcy court to conclude that the plan was feasible and the cramdown fair and equitable under a preponderance standard.

The United States Supreme Court has on several occasions discussed when particular standards of proof are applicable.  Chief Justice Burger in *Addington v. Texas* spoke of the different factual settings which prompt a particular standard.  "At one end of the spectrum is the typical civil case involving a monetary dispute between private parties."[14]  In such a case the "plaintiff's burden of proof is a mere preponderance of the evidence".[15]  At the other end of the spectrum is a criminal case.  The nature of a criminal proceeding has led our legal system to require that the guilt of the accused be proved beyond a reasonable doubt.  Between these two poles is some middle standard.  "The intermediate standard, which usually employs some combination of the words "clear,' "cogent,' "unequivocal,' and "convincing,' is less commonly used, but nonetheless "is no stranger to the civil law.' "[16]  The Chief Justice noted that this standard had typically been employed in civil cases when "the interests at stake are deemed to be more substantial than mere loss of money".[17]  He proceeded to cite several cases in which the Supreme Court had used the clear and convincing standard "to protect particularly important individual interests".[18]   These concerned deportation and denaturalization.  *Addington,* itself, concerned involuntary commitment to a mental institution, and the Court rejected the suggestion that preponderance was the correct burden.

This case clearly does not fit within any of the above "liberty" categories.  The Supreme

---

[13]*Briscoe,* 138 B.R. at 805.

[14]*Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979).

[15]*Id.*

[16]*Addington* at 424, 99 S.Ct. at 1808 quoting *Woodby v. INS,* 385 U.S. 276, 285, 87 S.Ct. 483, 487, 17 L.Ed.2d 362, 368 (1966).

[17]*Addington,* 441 U.S. at 424, 99 S.Ct. at 1808.

[18]*Id.*

Court, however, gives further guidance in several opinions in which it held that "clear and convincing" was the incorrect standard and that "preponderance" should be used. In *Herman & MacLean v. Huddleston*[19], Justice Marshall for the Supreme Court reversed this Court's conclusion that the clear and convincing standard was appropriate in a 10b-5 case, although the late Judge Rubin had suggested that because of its analogy to civil fraud and its effect on the defendant's reputation, the higher standard was the correct one. Justice Marshall's opinion relied on some older cases in which it seems that the Court contemplated only preponderance or reasonable doubt.[20] The Court unanimously refused, however, to depart from the preponderance standard although the case involved fraud. This may express a more restricted view of when clear and convincing is appropriate than the *Addington* Court which noted that clear and convincing had often been used in civil cases involving fraud or "some other quasi-criminal wrongdoing".[21]

In 1991, the Supreme Court in *Grogan v. Garner*[22] reversed the Eighth Circuit which had held that clear and convincing was the creditor's standard of proof to show that a debtor's debt was not dischargeable under 11 U.S.C. § 523(a) because it had been procured by fraud. The Court, after citing the "particularly important interests" language of *Huddleston* and *Addington,* observed that both the language of the statute and the statutory history were silent as to burden of proof. The Court viewed this silence as "inconsistent with the view that Congress intended to require a special, heightened standard of proof".[23] Moreover, the Court examined the conflicting interests and concluded that proof by a preponderance of the evidence would reflect "a fair balance" between the

---

[19]459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

[20]*U.S. v. Regan,* 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914) (preponderance is appropriate in a civil suit even though it involves proof of acts that expose a party to a criminal prosecution). *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (preponderance is sufficient to establish fraud under § 17(a) of the 1933 Act).

[21]*Addington* 441 U.S. at 424, 99 S.Ct. at 1808, 60 L.Ed.2d at 329.

[22]498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

[23]*Grogan* at 286, 111 S.Ct. at 659, 112 L.Ed.2d at 764.

conflicting interests.[24]

In this case, the district court found *Grogan* inapplicable because it involved dischargeability. Considering the other precedents and the process of the *Grogan* Court, we find this to be too narrow a reading of *Grogan.* In this case, both § 1129 and the legislative history are silent as to the burden of proof. This case is solely about money. There are not even any quasi-liberty interests at stake. It is correct, of course, as Justice Brandeis noted during the depression in a case involving the significant alteration of farm mortgagees' rights, that the Bankruptcy laws are subject to the Takings clause.[25] The Code, however, has been the primary source of the creditors' protections not the Fifth Amendment. Congress provides protections for creditors, and in many instances it allows debtors to impinge on creditor's state law rights. Bankruptcy frequently rewrites the secured creditor's state law bargain. An example of this is the automatic stay of § 362, as a result of which the creditor has lost the right of foreclosure. The calculation of claims under § 502 is another example of the Code rewriting the secured creditor's bargain. The combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.[26]

B. *Feasibility of the Reorganization.*

As numerous courts have explained, "the court need not require a guarantee of success,"[27] which of course would be difficult to predict for any venture much less one emerging from chapter

---

[24]*Grogan* at 287, 111 S.Ct. at 659, 112 L.Ed.2d at 765.

[25]*Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

[26]Heartland suggests that because the word "indubitable" (meaning, according to Webster, "too evident to be doubted; unquestionable") is used in the fair and equitable requirement of § 1129(b), a cramdown requires more than preponderance. Heartland is confusing the issue. § 1129(b)(2)(A)(iii) states that "With respect to a class of secured claims, the plan provides ... for the realization by such holders of the indubitable equivalent of such claims." Under this option, the debtor must show that the creditor will receive the indubitable equivalent of its claims by a preponderance of the evidence. The level of proof to show indubitability is not raised merely by the use of the word "indubitable". "Indubitable" modifies "equivalent" not "provides". Section F discusses the debtor's satisfaction of the fair and equitable requirement.

[27]*See e.g. In re Lakeside Global II,* 116 B.R. 499, 507 (Bkrtcy.S.D.Tex.1989).

11. "Only a reasonable assurance of commercial viability is required."[28]  Our task is to determine whether it was clearly erroneous for the bankruptcy court to find that the plan provided a reasonable assurance of commercial viability by a preponderance of the evidence.

This case presents a difficult appellate review because the bankruptcy court has itself acknowledged that the reorganization has only a "marginal prospect of success".  The district court paraphrased the familiar language from *Anderson v. Bessemer City* in which the Supreme Court reiterated that the clearly erroneous standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it would have decided the case differently"[29].  It does not, however, appear to have taken these words to heart nor those of Justice Jackson to which the *Anderson* Court referred, who explained in the well-known antitrust case, *U.S. v. Yellow Cab,*[30] that "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous".[31]  The *Anderson* Court further explained that, "This is so even when the [finder of fact's] findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts."[32]

The bankruptcy court found that the debtor could fund its debt service to Heartland and pay operating expenses out of its rental income.  The bankruptcy court noted that occupancy had increased at the property during the pendency of this case from 55% to 85%, and that evidence suggested that occupancy would increase to 90%.  The debtor's historic turnover rate is considerably less than its neighbors, and it requires a one-year lease and a security deposit.  Although economic occupancy is less than physical occupancy because of promotions, there is no indication that this is more than a temporary occurrence.  Heartland has further suggested that the debtor is unable to pay

---

[28]*Id.*

[29]470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985).

[30]338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949).

[31]*Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511 paraphrasing *Yellow Cab,* 338 U.S. at 342, 70 S.Ct. at 179.

[32]*Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511.

for necessary repairs. The bankruptcy court found that some of the repairs are urgent, and these could be funded from insurance proceeds. The rest could be delayed and paid out of cash flow. Although the bankruptcy court cautioned the debtor that it "will have to work diligently to make this Plan succeed", it found that there was a reasonable prospect for success and that the plan would not likely be followed by further reorganization or liquidation. True, some triers of fact *may* have found that the evidence tipped slightly against feasibility, but the bankruptcy court's finding that this plan was feasible can not be characterized as clearly erroneous.

## C. *Classification of Claims*

Heartland argues that the debtor's separate classification of the unsecured creditors violated § 1122.[33] Although all the unsecured creditors will receive the same treatment, classification matters because to effect a cramdown at least one impaired class must vote to accept the plan. If there was only one unsecured class, Heartland's ten million dollar claim would prevent the class from accepting the plan under § 1126, and cramdown would not be allowed. We must determine therefore whether the bankruptcy court erred in permitting this separate classification.

*Matter of Greystone*[34] is a recent and leading case on classification of claims. The general rule of *Greystone* is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."[35] *Greystone,* however, recognized that there may be good business reasons to support separate classification. *Greystone* also noted that, "Whether there were any good business reasons to support the debtor's separate classification is a question of fact" and

---

[33]11 U.S.C. § 1122 provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

[34]*Matter of Greystone,* 948 F.2d 134 (5th Cir.1991) *cert. den.* --- U.S. ----, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992).

[35]*Greystone* at 139.

thus subject to clearly erroneous review.[36] The Court of Appeals for the Sixth Circuit in *U.S. Truck*[37] enunciated the business reason justification for separate classification. In *U.S. Truck,* the court allowed the debtor to place the Teamsters in a separate class because the Teamsters had "a different stake in the future viability of the reorganized company and [had] alternative means at its disposal for protecting its claim".[38] While the business justification was sufficient in *U.S. Truck,* it was not in *Greystone,* because there was no evidence that the debtor's ongoing business would be affected if separate classification were not permitted.

These two carefully considered opinions guide our discussion in this case. The city of Fort Worth is distinct from other creditors including Heartland. Not only does it have non-creditor interests relating to its urban housing program, but it contributes $20,000 a month in rental assistance. Heartland argues t hat the plan is not feasible because there is no assurance of continued rental assistance from the city. This argument suggests that the relationship with the city is essential to the continued operat ion of this housing complex. Its continuing contributions and interests make it distinct from Heartland and the trade creditors. We emphasize the narrowness of this holding. In many bankruptcies, the proffered reasons as in *Greystone* will be insufficient to warrant separate classification. Here it seems justified. Moreover, as Heartland nominates one of the three trustees, it has means for protecting its interests. Therefore, we hold that the bankruptcy court was not clearly erroneous in separately classifying the city's unsecured claim.

D. *The Good Faith Requirement*

§ 1129(a)(3) requires that the debtor propose the plan in good faith. This Court has held that, "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied."[39] The bankruptcy court found good faith because "the Plan provides a vehicle for restructuring the debt of

---

[36]*Greystone* at 141 n. 7.

[37]*In re U.S. Truck,* 800 F.2d 581 (6th Cir.1986).

[38]*U.S. Truck* at 587.

[39]*Matter of Sun Country Development, Inc.,* 764 F.2d 406, 408 (5th Cir.1985).

the Property and preserving the Property for the benefit of both creditors and the Fort Worth community. Moreover, none of the interest holders of the Debtor will retain anything under the Plan." A plan may not be the one that the creditors would themselves design and may indeed not be confirmed and yet still pass the good faith requirement. This plan which the bankruptcy court did confirm and in which the debtor will not retain any equity interest satisfies the good faith requirement.

E. *The Best Interests of Creditors Test*

§ 1129(a)(7) requires that each holder of a claim in a class either accept the plan or receive at least as much as it would receive in a chapter 7 liquidation. Because only Heartland objects, our task is to determine whether it will receive as much under the plan in present value terms[40] as it would if the property were sold today. The bankruptcy court assigned a value of $8.2 million to the property. Assuming that the property could be sold today, that is the amount the court concluded that Heartland would receive, and that is all that Heartland would ever receive. Under the plan, Heartland will not only receive $8.2 million but could receive periodic payments towards its unsecured claim.[41] In addition, it will share in any appreciation in the property. We need not concern ourselves with any additional benefits Heartland may receive, for § 1129(a)(7) requires only that Heartland receive the present value of $8.2 million. There is no evidence that the property will decline in value before Heartland is paid in full its $8.2 million secured claim, and as explained in the next section of this opinion, the interest rate fully compensates Heartland for the delay in payment. Heartland may wish to cut its losses now rather than wait and see if it may eventually receive more, but the rationale underlying Congressional establishment of the cramdown prevents the creditor from blocking a fair and feasible reorganization.

F. *The Fair and Equitable Requirement for a Cramdown.*

---

[40]*In re Mortgage Investment Co. of El Paso, Texas,* 111 B.R. 604, 615 (Bkrtcy.W.D.Tex.1990).

[41]The absolute priority rule is not implicated because no class junior to Heartland's dissenting unsecured class will receive or retain anything under the plan.

§ 1129(b) requires that a cramdown be fair and equitable.[42] The statute provides three alternative minimum requirements for the plan to be considered fair and equitable with regard to secured creditors:

> 1129(b)(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)(I) that the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the lien securing such claims, free and clear of such lien, with such lien to attach to the proceeds of such sale, and the treatment of such lien on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

The bankruptcy court held the plan to be feasible under the first option. The district court reversed as it viewed the "indubitable equivalent" language as mandatory rather than as one of three options.[43]

While this Court has held that simple technical compliance with one of the three options in 1129(b)(2)(A) may not necessarily satisfy the fair and equitable requirement,[44] it has not transformed the "or" in 1129(b)(2)(A) into an "and". As we hold that the plan satisfies 1129(b)(2)(A)(i), we need

---

[42]For a recent discussion of the fair and equitable requirement *see* Jack Friedman, *What Courts Do To Secured Creditors In Chapter 11 Cram Down,* 14 Cardozo L.Rev. 1495 (1993).

[43]The district court stated that, " "Fair and equitable' as used in the context of a cramdown means that, at a minimum, the secured creditor must receive the indubitable equivalent of his secured claim." *Briscoe* at 810.

[44]*Matter of D & F Construction, Inc.,* 865 F.2d 673, 675-76 (5th Cir.1989). In that case, the plan's negative amortization required the secured creditor to contribute additional money to the plan for twelve years before principal would be repaid. The creditor's ability to foreclose during this period was also impaired. This Court assumed for purposes of the case that the requirements of 1129(b)(2)(A) had been "literally met."

not attempt to decipher the meaning of "indubitable equivalent".[45]

1129(b)(2)(A)(i) requires that the secured creditor retain its lien and receive "deferred cash payments totaling at least the allowed amount of such claim". The district court was concerned that the plan did not adequately ensure that Heartland will retain its liens. We interpret the plan as ensuring that if the debtor fails to comply with its debt service obligations, Heartland would have the right to foreclose. The language about the "letter and spirit of the plan" is not intended to affect Heartland's right to foreclose if it does not get paid what it is due under the plan. Deferred cash payments consist of an appropriate interest rate and an amortization of the principal which constitutes the secured claim.

We review a bankruptcy court's calculation of an appropriate interest rate for clear error.[46] Courts have used a wide variety of different rates as benchmarks in computing the appropriate interest rate (or discount rate as it is frequently termed) for the specific risk level in their cases.[47] In this case the bankruptcy court adopted the contract rate which was 10.25%. Numerous courts have chosen the contract rate if it seemed to be a good estimate as to the appropriate discount rate.[48] Often the contract rate will be an appropriate rate but reference to a similar maturity Treasury rate is instructive. The Treasury rate is helpful because it includes all necessary factors except the risk premium.[49] Treasury bonds with 15 years to maturity (the term of this reorganization) were priced at around 6.4% in June 1993. A discount rate of 10.25% is more than 50% greater than the riskless

---

[45]One author has commented that, "More has been written on indubitable equivalence with less effect than on almost any other area of bankruptcy law." Richard F. Broude, *Reorganization Under Chapter 11 of the Bankruptcy Code,* 13-24 (1986).

[46]*In re Bryson Properties XVIII,* 961 F.2d 496, 500 n. 5 (4th Cir.1992).

[47]A properly calculated interest rate should factor in the appropriate risk. *See e.g. In re Guildford Telecasters, Inc.,* 128 B.R. 622 (Bkrtcy.M.D.N.C.1991); *In re Sherwood Square Associates,* 107 B.R. 872 (Bkrtcy.D.Md.1989). C. Frank Carbiener's *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate,* 32 S.D.L.Rev. 42 (1987) is an excellent introduction to this subject.

[48]*See e.g. In re Monnier Bros.,* 755 F.2d 1336, 1339 (8th Cir.1985); *Guildford* at 626.

[49]We assume that Treasury bonds as they are backed by the United States Government contain zero risk.

rate. This risk premium is comparable with that of many "junk bonds". While it may in fact be too high a rate considering that we only reach this stage once the plan has been judged feasible,[50] it was not clearly erroneous for the bankruptcy court to find that this risk premium adequately compensates Heartland for not receiving its money today.

Having found the interest rate to be acceptable, we must next consider the balloon payment. These two issues are interrelated for the balloon payment adds some measure of risk, but the interest rate appears adequate to cover this risk. Heartland and the district court suggest that allowing a balloon payment is unacceptable as there is no immediate indication from where the funds will come to pay off the balloon. As a general matter, many courts have held balloon payments to satisfy 1129(b).[51] It is reasonable to assume that the property itself will provide the source for the balloon payment. There is no evidence that the property will decline in value. Therefore, when the balloon is due, either the property will be sold which will provide the balloon or refinancing will be possible.[52] Estimating property values fifteen years hence is inherently speculative, but the evidence presented to the bankruptcy court did not suggest that the property would decline in value so that the debtor would be unable to pay Heartland its remaining principal. Therefore, we hold that the plan satisfies 1129(b)(2)(A)(i). No other factors in this case lead us to hold that compliance with 1129(b)(2)(A)(i) fails to satisfy the fair and equitable requirement. Accordingly, we affirm the bankruptcy court's holding that the plan is fair and equitable.

G. *Administrative Claims and Use of Cash Collateral.*

Heartland argues that the debtor impermissibly hired an appraiser, an architect, and a marketing consultant. The bankruptcy judge approved these nunc pro tunc. Heartland suggests that this is an impermissible use of cash collateral in violation of § 506(c), and that no exceptional circumstances warranted the nunc pro tunc order.

---

[50]*See In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 658 n. 8 (Bkrtcy.D.N.J.1980).

[51]*See e.g. Bryson* at 501; *Guildford* at 627.

[52]This satisfies § 1123(a)(5) which requires that the plan provide adequate means for its implementation.

We review the bankruptcy court's implicit finding of no violation of § 506(c) under the clearly erroneous standard.[53] Its nunc pro tunc order is reviewed for abuse of discretion.[54]

Heartland is correct that this Court has denied a utility bill under § 506(c). In that case, however, this Court upheld a bankruptcy court's conclusion because it was not clearly erroneous to conclude that keeping the lights on did not benefit the creditor of a bankrupt hotel, whose security interest was solely in the building and movables and had no interest in the operation. The district judge had reversed the bankruptcy judge, and this Court observed that while "there is evidence to support the district court's findings [that the utilities prevented the deterioration of the building and maintained the going concern value], the district court does not enjoy absolute freedom to make its own findings".[55] There is also considerable difference between utility expenses for a bankrupt *hotel* and hiring an appraiser, an architect, and a marketing consultant for an operating and expanding *apartment* complex in which the creditors have a considerable interest. Indeed as the bankruptcy court used the appraiser's estimate and the occupancy rate increased after the architect and marketing consultant were hired, it does not seem clearly erroneous for the bankruptcy court to have permitted these expenses. The bankruptcy court found that the marketing consultant's fee of $23,000 was justified. We affirm that finding but urge prudence on the part of debtors and careful scrutiny on the part of bankruptcy courts to ensure that expenses are tailored carefully to the need.

As for these orders being nunc pro tunc, the equitable discretionary powers of the bankruptcy court are broad; in this situation the bankruptcy court did not abuse its discretion in granting these orders nunc pro tunc. These expenses were incurred during a period when the debtor's original counsel was forced to recuse itself as a result of a conflict and replacement representation had not yet been retained. Very soon after the debtor obtained substitute counsel, approval of the debtor's use and retention of these professionals was sought. Therefore, while again encouraging bankruptcy court's to examine carefully the grant of nunc pro tunc orders, we hold that in this case the

---

[53]*Matter of Delta Towers,* 924 F.2d 74, 77-78 (5th Cir.1991).

[54]*Matter of Triangle Chemicals,* 697 F.2d 1280, 1288-89 (5th Cir.1983).

[55]*Delta Towers* at 78.

bankruptcy court did not abuse its discretion.

V.

This is a difficult case and both the bankruptcy court and the district court are to be commended for their efforts. We REVERSE the district court and AFFIRM the bankruptcy court's confirmation of the plan and orders nunc pro tunc and wish the trustees good luck in reorganizing this property.