**In the Matter of INTER URBAN BROADCASTING OF ST. LOUIS, INC., Debtor.**

**Civ. A. No. 94–0776.**

United States District Court, E.D. Louisiana.

Nov. 3, 1994.

---

Stat. ann. 13: 4231(3) (West 1991).

Elisabeth Dodds Harrington, Law Offices of Elisabeth D. Harrington, New Orleans, LA, Kirk L. Myers, Harrington & Myers, New Orleans, LA, for appellant William B. Schutz.

Ashton Richard Hardy, Hardy & Carey, Metairie, LA, for appellee Blackburn & Co.

Robyn Jeana Spalter, Bronfin & Heller, New Orleans, LA, for appellees Inter Urban Broadcasting of New Orleans Partnership, Inter Urban Broadcasting of Cincinnati, Inc. and Inter Urban Broadcasting of St. Louis, Inc.

## ORDER AND REASONS

PATRICK E. CARR, District Judge.

This matter is before the court on appeal from the Bankruptcy Court. For reasons that follow, the decisions of that court are AFFIRMED.

## BACKGROUND

Two brokers assert claims to the commission earned on a sale of estate assets. In 1989, Inter Urban Broadcasting of St. Louis, Inc. ["Inter Urban" or "Debtor"] and appellant William Schutz agreed in writing that Schutz would broker the sale of an AM radio station (Inter Urban also owned an FM station) and that Schutz would be paid a commission on sale of the station "to Noble Broadcasting ["Noble"], or any other party that he introduces...." Inter Urban and Noble agreed on terms in 1989, but the sale was not consummated because Noble could not arrange financing.

Inter Urban filed a Chapter 11 petition two years later, November, 1991. The bankruptcy court declined Debtor's motion to authorize appellee Blackburn and Company ["Blackburn"] as appraiser and broker for both stations, but authorized Blackburn as appraiser only. On motion of Debtor, Schutz was employed as non-exclusive broker for both stations, and Schutz and Debtor signed another agreement.

Blackburn, after completing and being compensated for the appraisals and with the oral approval of Debtor, contacted Noble and started negotiations for the sale of both stations. In January, 1993, the court approved Debtor's Plan of Reorganization ["Plan"], which included a sales agreement whereby Noble was to buy both stations and Blackburn was to be paid the commission. The sale was consummated.

Blackburn, now with its own attorneys, filed a Motion for Approval of Brokerage Fee and Declaration of Entitlement. Schutz opposed the motion, now with his own attorneys. At the hearing, Blackburn moved orally for appointment *nunc pro tunc* as broker, and Debtor later filed a motion to the same effect.

The Bankruptcy court granted Blackburn's motion for approval of the brokerage fees and declaration of entitlement; granted the motions for *nunc pro tunc* appointment of Blackburn; and ordered that Blackburn be paid the commission.

## DISCUSSION

Both Schutz and Blackburn assert entitlement to the commission. Such commissions are administrative expenses of the estate, 11 U.S.C. § 503(b),[1] and are first-priority claims

---

1. Further references to "§" are to sections within     11 U.S.C.

**444**

in the distribution, § 507(a)(1). The separate issues are whether either claimant is entitled to an administrative expense claim on the assets of the estate.

■ This court may reverse the bankruptcy court's factual findings if they are clearly erroneous; legal determinations are reviewed *de novo*. *Matter of Foreman*, 906 F.2d 123, 125 (5th Cir.1990). Federal Rule of Bankruptcy Procedure 8013 provides, in part relevant here, that on review by district court "... due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

### I. *Schutz' Entitlement*

Schutz premises his entitlement on his 1989 contract provision that he would be paid a commission on the sale to any party introduced, the fact that he introduced Noble, his activities, the approval of himself as broker, and his post-petition contract. The bankruptcy court's concluding paragraph on Schutz' entitlement is:

> The law is clear that a broker who does not produce a buyer is not entitled to a commission. [Citations omitted.] Here, as of the commencement of these proceedings, Schultz [sic] had not produced an executed purchase agreement. This Court cannot enforce a pre-petition agreement such as Schutz's July 27, 1989[,] agreement with Inter Urban, as this agreement was not approved by this Court post-petition and produced no benefit for the estate.

The ultimate phrase, "no benefit for the estate," is the most important.

A broker is a professional whose employment must be approved by the court, § 327. Section 330 provides, in part, that:

> the court may award ... to a professional person ... reasonable compensation for ... services rendered ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services....

The court finds *In re Eastern Inns of New Hampshire, Inc.*, 72 B.R. 418 (Bkrtcy.D.Me.

1987) to be well-reasoned. An unauthorized broker, whose contract included a clause similar to Schutz', produced the buyer but did not complete the transaction. The court ruled that the broker would not be entitled to a commission, even if appointed, because it had produced no benefit to the estate.

Whether Schutz benefitted the estate is fact-intensive, and, as stated, this court reviews fact-finding only for clear error.

> ... A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.... This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.... If the [fact-finding] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing] court may not reverse it even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Matter of Webb*, 954 F.2d 1102, 1104 (5th Cir.1992), quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

### A.

■ Schutz contests the bankruptcy court's findings that the proposed sale of the AM station to Noble never came to fruition and that his involvement in negotiations was over by the filing of the petition. He asserts that the bankruptcy court erred in depending on the testimony of witnesses who said otherwise (Assignment 5).

James Hutchinson, executive vice-president of Debtor, testified that Noble was unable to conclude the Schutz-brokered deal by the fall of 1989 and Schutz' efforts became "a dead issue" to Debtor. Tr. 8–11, pp. 46, 47.[2] Thomas Lewis, co-owner of the stations, tes-

---

2. The hearing occurred on August 11 and 12, 1993. References to the transcripts are "Tr.

Date, p.N."

tified that the 1989 proposed sale in which Schutz had been involved "died" when Noble could not get financing approval. Tr. 8–11, pp. 59–60.

Schutz testified to extensive negotiations in the summer and fall of 1989, but said that his next involvement was in July, 1990. Tr. 8–12, p. 45. His testimony reflects subsequent intermittent contacts with Noble and Debtor up to the filing of the petition. Tr. 8–12, pp. 47, 52, 54. Schutz' testimony indicates merely that he maintained contact with Noble, who assured him of their interest and that their financing problems would be resolved shortly.

The finding that "Any efforts Schutz may have made were ... fruitless by the time Inter Urban filed for relief...." is not clearly erroneous.

### B.

■ The bankruptcy court wrote that Schutz testified that he had no post-petition contact with Noble, which finding Schutz attacks (Also Assignment 5). Schutz testified that post-petition, in December, 1991, he called his usual contact with Noble and was told that Noble's financial problems would soon be resolved and that Schutz should call back. Tr. 8–12, p. 60. Schutz said he called again in February, 1992, and, learning that his usual contact had left the company, left a message for another person to call him. Tr. 8–12, p. 66. No one returned that call or others. In sum, Schutz' testimony was that he had post-petition contact with Noble only to the extent of being put off in December, 1991, and having several later calls unreturned. The bankruptcy court's finding that Schutz said he had no contact with Noble post-petition is not clearly erroneous.[3]

### C.

The bankruptcy court found that Schutz was not involved in selling the FM station.

Schutz complains the court ignored evidence that government regulations pre-petition precluded his offering the FM station to Noble (Assignment 14). He does not indicate how this changes matters and it does not appear that he would have been more successful had he been offered both stations in 1989.[4]

### D.

■ Schutz' argument is that his introducing Noble and keeping in contact with Noble benefitted the estate. However, both brokers testified that Noble was the natural buyer for Debtor's stations. Blackburn, Tr. 8–12, p. 21; Schutz, Tr. 8–12, pp. 39–40. Whether Schutz had been involved or not, Blackburn would have contacted Noble, and did so without knowledge of Schultz' prior contacts. Tr. 8–11, pp. 102–103. The facts that in 1989 Schutz and Debtor agreed that Noble would be an appropriate buyer for the AM station and that Schutz brought Noble into negotiations are not enough, by themselves, to show that Schutz produced benefit to the estate in the final sale of both the AM and FM stations over three years later. This is essentially all that Schutz offers, and it does not suffice.

The bankruptcy court's ultimate finding on Schutz' entitlement to a commission, that he produced no benefit to the estate, is not clearly erroneous or an error of law and will not be disturbed. Absent benefit to the estate, the terms of Schutz' contract(s) and the interpretations of them [5] and minor misstatements in the court's opinion [6] do not matter. This is a bankruptcy proceeding and the issue is whether Schutz is entitled to be paid from the assets of the estate. Absent benefit to the estate, he is not so entitled.

### II. *Blackburn's Entitlement*

As to Blackburn's entitlement, this court has carefully read Schutz' filings on appeal

---

3. Schutz complains that he had no contacts because Blackburn represented to Noble that it was the broker in the deal (Also Assignment 5). That does not make the finding that he had no such contacts erroneous.

4. Schutz complains that the bankruptcy court did not consider the fact that the sale he brokered was not completed only because of Noble's financial position, not because of any lack of effort on his part (Assignment 3). That merely shows that Schutz did not produce an able buyer.

5. Assignments of error 2, 4, 6.

6. Assignment 1.

and, other than his assertions to his own entitlement, Schutz has not challenged the finding that Blackburn's activities produced benefits to the estate. This court will not disturb that finding. Further, considering his own averment of entitlement, Schutz cannot assert, and has not asserted, that there is prejudice to the Debtor if the commission is paid to someone.

### A.

Regarding the fact that the approved Plan contained the purchase agreement, which in turn contained language to the effect that Blackburn had earned the commission, Schutz assigns three errors. He asserts that the court erred in relying on its own approval of the plan as a basis for approval of Blackburn as a broker (Assignment 8); that the bankruptcy court referenced an incorrect date in the opinion (# 7); and that the court discussed his lack of objection to the plan when he had no reason to object until he was sure the commission was not to be paid to him and he was depending on Debtor's counsel during the relevant times (# 9).

As to the court's relying on the approval of Blackburn in the Plan, Schutz reads too much into the opinion. The court merely stated that the approved plan included the commission and pointed out that no one objected and that Blackburn was aware of the approval of the Plan. The opinion does not indicate that the court felt bound by the Plan to approve Blackburn as broker.

■ The bankruptcy court wrote, "Even Schutz, who testified that he knew of Blackburn's involvement as early as July, 1991, failed to contact Debtor's counsel or to file an objection to the Plan." Schutz complains that 1991 is wrong, and should be 1992. That is correct, but the rest of the sentence deals with post-petition matters; and whether Schutz became aware in 1991 or 1992, he had knowledge of the matter for several months before the submission of the plan. The basic finding regarding Schutz' knowledge and lack of objection is not clearly erroneous.

As to Schutz' assertion that he had no reason to object until he had definite knowledge that he was not to be paid the commission, his testimony shows such knowledge early on. He said that he knew he "had a problem" when no one returned his telephone calls, Tr. 8–12, p. 72, and that when he spoke to Blackburn he was told that Blackburn did not know of Schutz' involvement and that the commission would not be shared. Tr. 8–12, p. 71. The record, throughout, shows that Noble did not return calls after December, 1991, and Debtor did not return calls after April, 1992. By July, 1992, when Schutz spoke with Blackburn, it had been months since he had spoken to any party, but he still took a "wait-and-see attitude." Tr. 8–12, p. 95. Schutz said he did not contact Debtor's attorneys, on whom he was depending, regarding his concerns. Tr. 8–12, p. 92. Schutz did testify that he once mentioned the matter to a person at Debtor's company with whom he had little direct dealing, but was told that his regular contact would have to handle the problem. Tr. 8–12, p. 93.

It is plausible that Schutz knew at least by July, 1992, that he was not to be paid the commission and did nothing for months about his knowledge. The finding of fact regarding Schutz' non-assertion of his alleged rights will not be disturbed.

### B.

■ The bankruptcy court found that the equities supported Blackburn's claim to the commission, given its extensive successful efforts, and that Blackburn acted in good faith. Schutz attacks these findings, pointing out that Blackburn performed as broker after Debtor was denied authorization to employ Blackburn as broker. Schutz avers that Blackburn knew of the necessity of such approval of employment because a court had denied Blackburn a commission when it had not been approved [7] and a national association to which Blackburn belonged had communicated to its members the necessity of such approval. From this posited knowledge, Schutz avers that Blackburn and Debtor colluded to work a fraud on the court;

---

**7.** *In re Providence Television,* 113 B.R. 446 (Bkrtcy.N.D.Ill.1990).

that Blackburn committed perjury in denying such knowledge and acted in extreme bad faith; and that the court should have held Blackburn responsible for its failure to directly determine whether it had been approved as a broker (Assignments 10, 12, 13).

All this evidence was placed before the bankruptcy court during the examination of Mr. James Blackburn, who personally brokered the sale to Noble and who testified for Blackburn. Tr. 8–12, pp. 4–31. Blackburn testified that he signed an affidavit which accompanied the application as both appraiser and broker, but was not aware the court denied the application (p. 10–11). He testified that he was not aware that a broker had to get authorization of the court to act as broker (p. 27) and that his company did not itself apply to the bankruptcy court for authorization as a broker in this case (p. 19). He said that he did not remember oral and written communications from the national association regarding the importance of authorization (p. 25–26). He recalled *Providence Television,* but said he could not remember its details or the court's ruling (p. 28). Blackburn knew that the Plan, including Blackburn's commission, had been approved without opposition (Tr. 8–11, p. 115).

Debtor's attorney testified that her office filed all documents for approval of both Schutz and Blackburn (Tr. 8–12, p. 117). She said that Blackburn was sent a letter stating that the court asked that the application for authorization to employ Blackburn be amended, and a new affidavit was attached, but that the firm's records did not indicate that Blackburn was sent any copies of the bankruptcy court's orders (p. 112).

The bankruptcy court reviewed this testimony in its opinion and obviously credited it, though the opinion does not mention *Provi-* *dence Television* or the national association matters. The bankruptcy court judged the credibility of James Blackburn and found that Blackburn "acted in good faith throughout these proceedings." Based on the evidence as a whole, this finding is plausible and, given deference to the bankruptcy court's determination of credibility, this court may not disturb it.

### C.

■ Section 327 provides that "... professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons...." may be employed. Schutz submits that the bankruptcy court erred in finding that Blackburn was fully disinterested and had no adverse interests to the estate (Assignment 11.) Schutz asserts, "Having been previously employed as the media appraiser for the sale of [the stations], Blackburn was not disinterested and had an adverse interest to the estate in then acting as the broker for [the stations], thus precluding it from receiving compensation for its brokerage services." Schutz has presented no authority for this assertedly *per se* proposition.[8]

An expert in the field of media appraisals, brokerage, and sales testified that it was common in the broadcast industry for one person to serve as both appraiser and broker. Tr. 8–11, pp. 16–17. Schutz testified that he had acted and been paid as both appraiser and broker in some instances. Tr. 8–12, pp. 87–88. In this case, Blackburn testified that he completed the appraisal and had been paid in March, 1992. Tr. 8–11, pp. 85, 88. The next month Blackburn approached the debtor and received permission to broker the sale. Tr. 8–11, p. 87.

---

8. Schutz cites three inapposite cases. *Woods v. City Nat. Bank & Trust Co. of Chicago,* 312 U.S. 262, 268–69, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941), on a related issue, stands for the proposition that a when a fiduciary claims compensation and "Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation." *Matter of Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1256 (5th Cir.1986) involved an attorney who represented the estate and also represented at least one director of the Debtor, where the FDIC had challenged the action of the Debtor's directors and officers. The appellate court remanded for additional findings and conclusions on whether the attorney was entitled to compensation. *Brennan's Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 173–74 (5th Cir.1979) is not a bankruptcy case and the cited pages merely present a discussion of the considerations involved in deciding whether to disqualify an attorney because of ethical concerns arising from sequential representation of adverse clients.

Other than offering an unsupported principle, Schutz has indicated no evidence that Blackburn had an interest adverse to the estate or was not completely disinterested. The bankruptcy court's finding regarding disinterestedness and lack of adverse interests was not clearly erroneous in fact and there was no error of law in this conclusion.

### D.

■ The remaining issue is the propriety of appointing Blackburn *nunc pro tunc.* [9] Schutz suggests error (Assignment 12). Though court approval prior to employment is clearly contemplated in § 327, in *Matter of Triangle Chemicals, Inc.,* 697 F.2d 1280, 1289 (5th Cir.1983), the court held:

> that, where through oversight the attorney has neglected to obtain ... prior approval but has continued to perform services for the debtor/debtor in possession (many of them as here under the eye of the court itself), the bankruptcy court retains equitable power in the exercise of its sound discretion, under exceptional circumstances, to grant such approval nunc pro tunc, upon proper showing, and to award compensation for all or part of the services performed by such attorney that have subsequently benefitted the debtor's estate and, consequently, its creditors.

In *Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1170 (5th Cir.1993), the court, citing *Triangle Chemicals,* approved the *nunc pro tunc* appointment of an appraiser, an architect and a marketing consultant.

■ A bankruptcy court's *nunc pro tunc* order is reviewed for abuse of discretion. *Ibid.* The abuse of discretion standard is more deferential than the clearly erroneous standard. See, *Osuchukwu v. Immigration & Naturalization Service,* 744 F.2d 1136, 1142 (5th Cir.1984).

■ The bankruptcy court summarized the holding of *Triangle Chemicals* as:

> Approval of a professional nunc pro tunc is appropriate when the professional meets the usual standards of employment and

where prior approval was not obtained due to excusable neglect.

Schutz suggests that, per *Triangle Chemicals,* the "test" for *nunc pro tunc* appointment is not "excusable neglect," but "exceptional circumstances." Schutz has alluded to no authority subsequent to *Triangle Chemicals* indicating an "exceptional circumstances" test and the court has found none. In a later *nunc pro tunc* case, the court did not mention exceptional circumstances, but reiterated "neglect." *In re Anderson,* 936 F.2d 199, 204 (5th Cir.1991). In *Briscoe, supra,* a party asserted that no exceptional circumstances warranted the *nunc pro tunc* order, but the court approved the order without mentioning exceptional circumstances, stating that the bankruptcy court's discretionary powers were broad and that under the facts of the case there had been no abuse of discretion. 994 F.2d at 1170. While the discussions in *Anderson* and *Briscoe* do not negate exceptional circumstances as a factor to be considered, they do indicate that the phrase does not constitute a "test." The court's reference to "excusable neglect" is not an error of law.

■ As to excusable neglect, the bankruptcy court adopted a standard from *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership,* — U.S. ——, ——, 113 S.Ct. 1489, 1498, 123 L.Ed.2d 74 (1993) (involving Rule 9006(b)(1) and its provision that when an act has not been done timely under the Rules, a bankruptcy court may, in its discretion, "permit the act to be done where the failure to act was the result of excusable neglect.") As to excusable neglect, the Court stated (as quoted by the bankruptcy court):

> the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice to the debtor, the length of the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

---

**9.** Schutz suggests that the court erred in failing "to strictly enforce the Bankruptcy Rules governing" *nunc pro tunc* appointment [Assignment 12(c)]. But, there are no Bankruptcy Rules governing nunc pro tunc appointment. Such appointments are within the discretion of the court.

*Ibid.* Schutz suggests that the use of this standard was error because *Pioneer* was factually inapposite to this case [Assignment 12(d)]. However, the *Pioneer* Court discussed at length "neglect" and "excusable neglect," and the understanding of the terms in various contexts. —— U.S. at ——–——, 113 S.Ct. at 1494–98. There was no error of law in the bankruptcy court's adopting the *Pioneer* discussion as a valid indication of the factors to be considered in the exercise of the court's equitable and discretionary powers regarding excusable neglect.

Having established the matters to be considered, the bankruptcy court found that: Blackburn acted in good faith; Blackburn had depended on counsel for Debtor; James Blackburn, the person responsible for the sale of the stations, had signed an affidavit for appointment as both appraiser and broker and was unaware of the revised affidavit which had been sent to his brother Richard; Blackburn was not notified of the final order appointing it appraiser only and had no other reason to know of it; and Blackburn knew that the court approved the sales agreement which included Blackburn's commission.

■ Schutz asserts, "The only justification asserted for nunc pro tunc appointment and which the Court improperly relied upon, is that Blackburn could not recall if he received a copy of the Bankruptcy Court's order prohibiting employment as both broker and appraiser." As seen, this is simply a misstatement of the opinion. Schutz suggests that the bankruptcy court should have held James Blackburn responsible for the knowledge of his brother, who received the second affidavit as to appraiser only [Assignment 12(a)], and should have held that Blackburn had a responsibility to check the court record regarding *its* authority as appraiser/broker [Assignment 12(b)].

As noted, Debtor's attorney testified that the second affidavit was sent to Blackburn with a cover letter stating that the court asked that the application for authorization to employ Blackburn be amended. (Tr. 8–12, p. 112). There is no firm evidence that either Blackburn brother ever knew that the company had not been approved as broker as well as appraiser. As to checking the record,

Blackburn did not itself apply for approval. Debtor applied for authorization to employ Blackburn. It cannot be said that the bankruptcy court should have required Blackburn to authenticate what it had apparently understood from its employer, the party before the court.

Schutz posits that the court should not have credited Blackburn's assertion, as an excuse for ignorance, that it had no attorney; when Schutz knew of the appointment requirements and complied with the Code. That argument loses force when it is remembered that Schutz advanced his own dependence on Debtor's counsel as a reason for not objecting to the Plan.

The factual findings of the bankruptcy court as to Blackburn's lack of adverse interest, disinterestedness, good faith performance, excusable neglect, benefit to the Debtor, and lack of prejudice to the Debtor are not clearly erroneous. The bankruptcy court did not misapply the law to its factual findings. The bankruptcy court's ultimate finding that Blackburn should be appointed broker *nunc pro tunc* was not an abuse of discretion.