**In re ARMSTRONG WORLD INDUSTRIES, INC., et al., Debtors.**

No. 00–4471.

United States District Court, D. Delaware.

Aug. 14, 2006.

Rebecca L. Booth, Mark D. Collins, Jason M. Madron, Rebecca Lee Scalio, Deborah E. Spivack, Shannon Stacy Frazier, Richards, Layton & Finger, Joanne Bianco

Wills, Klehr Harrison Harvey Branzburg & Ellers, Sharon M. Zieg, Young, Conaway, Stargatt & Taylor, Etta Rena Wolfe, Smith Katzenstein & Furlow LLP, Wilmington, DE, for Debtors.

MEMORANDUM

EDUARDO C. ROBRENO, District Judge.[1]

## TABLE OF CONTENTS

I.  Introduction ............................................................. 113

II.  Factual and Procedural History ........................................... 115
    A.  Overview ............................................................. 115
    B.  AWI and Asbestos Personal Injury Litigation ........................... 116
    C.  AWI's Bankruptcy ..................................................... 117
    D.  The Court's February 23, 2005 Denial of Confirmation .................. 118
    E.  The Modified Fourth Amended Plan of Reorganization ................... 118

III.  Legal Standards .......................................................... 119
    A.  Jurisdiction ......................................................... 119
    B.  Confirmation of a Reorganization Plan Under 11 U.S.C. § 1129 .......... 119
    C.  Unfair Discrimination ................................................ 121
    D.  The Principles of Estimation ......................................... 123

IV.  Evidence Adduced by the Parties .......................................... 125
    A.  Dr. Mark Peterson .................................................... 125
    B.  Dr. B. Thomas Florence ............................................... 127
    C.  Dr. Letitia Chambers ................................................. 129
    D.  The Expert Testimony—Similarities and Differences .................... 132

V.  The Expert Estimations Offered by the Plan Proponents Are More Persuasive
    Than That of the Plan Opponents ......................................... 134

VI.  Conclusion ............................................................... 136

## I. INTRODUCTION

Before the Court is Armstrong World Industries, Inc.'s Fourth Amended Plan of Reorganization, as modified. The sole objection to the Fourth Amended Plan of Reorganization, as modified (the "Plan") is asserted by the Unsecured Creditors' Committee (the "UCC"), Class 6, which claims that the Plan unfairly discriminates against the Unsecured Creditors in favor of the Asbestos Personal Injury Claimants (the "Asbestos PI Claimants"), Class 7. Therefore, the UCC argues, the Plan does not comply with Section 1129(b) of the Bankruptcy Code.[2] The Court must deter-

---

1. The Honorable Eduardo C. Robreno is a judge of the United States District Court for the Eastern District of Pennsylvania. On June 16, 2004, Chief Judge Anthony J. Scirica of the United States Court of Appeals for the Third Circuit designated Judge Robreno to sit on the United States District Court for the District of Delaware in the instant matter (doc. no. 6939).

2. After AWI and two of its wholly owned subsidiaries voluntarily commenced bank-

ruptcy in the United States Bankruptcy Court for the District of Delaware on December 6, 2000, the United States Trustee for the District of Delaware appointed: (1) the Official Committee of Unsecured Creditors; (2) the Official Committee of Asbestos Personal Injury Claimants; and (3) the Official Committee of Asbestos Property Damage Claimants. The Official Committee of Asbestos Property Damage Claimants was disbanded following the Global Asbestos Property Damage Settlement,

mine whether to confirm the Plan despite this objection.

The Court has considered the comprehensive submissions of Armstrong World Industries, Inc. ("AWI"), the Asbestos PI Claimants, and the Legal Representative for Future Asbestos Claimants (the "Plan Supporters" or "Plan Proponents"), and those of the UCC (the "Plan Opponents"), as well as the evidence presented in a three-day hearing and oral argument.

This is the second time this Plan has been before the Court; in February 2005 the Court denied confirmation of the Plan based on its violation of the absolute priority rule embodied in Section 1129(b) of the Bankruptcy Code, and the Third Circuit affirmed this decision on December 29, 2005. The Plan has since been modified to address the violation, thereby leaving only the UCC's present objection for resolution.

The Plan provides for Available Cash, Plan Notes, and Common Stock of AWI, amounting to approximately $2.8 billion, to be distributed to the Unsecured Creditors and the Asbestos PI Claimants. The Unsecured Creditors will receive approximately $982 million. This allocation allows for each holder of an Allowed Unsecured Claim to receive approximately 59.5% of its allowed claim, based on an undisputed estimate of an upper limit of $1.651 billion for the Unsecured Creditors' claims. The remaining Available Cash, Plan Notes, and Common Stock, amounting to approximately $1.8 billion, will be distributed to an Asbestos PI Trust, which will assume and manage liability for all present and future Asbestos PI Claims. Plan, Section 1.22, Exhibits 1.23, 1.24.

The UCC asserts that the allocation of $1.8 billion to the Asbestos PI Trust amounts to a 91.3% recovery for the Asbestos PI Claimants, based on an upper limit of $1.96 billion for the asbestos PI claims, and therefore unfairly discriminates against the Unsecured Creditors, who will only receive approximately 59.5% of their claims. The Plan Proponents respond that the asbestos PI claims will amount to at least $3.1 billion, thereby fixing the Asbestos PI Claimants' recovery at 59.5% or less.[3] In addition, the Plan Proponents state that the allocated value must be used for the costs of administering the Trust, and a part of the value will be reserved for an undetermined number of future personal injury claimants. Therefore, recovery for the personal injury claimants will be lower than for the Unsecured Creditors. Memorandum of Law in Support of Confirmation of Armstrong World Industries, Inc.'s Fourth Amended Plan of Reorganization, As Modified ("AWI Memo in Support") at 4–5.

If the liability for the asbestos PI claims amounts to less than $3.1 billion, then the $1.8 billion allocated to the asbestos PI trust amounts to a higher recovery for the Asbestos PI Claimants than for the Unsecured Creditors. The Court must therefore determine whether this is, in fact, the case. If the recoveries to be received are different, the Court must decide whether the difference amounts to discrimination, and if so, whether the discrimination is unfair.

Of course, the Court's inquiry is complicated by the fact that AWI's liability for asbestos PI claims is an uncertain number; the trust to which the money is allocated is

approved by the Bankruptcy Court on August 25, 2003.

**3.** The Plan itself does not contain the $3.1 billion asbestos liability number, as noted by the Plan Opponents. However, the determi-

nation of an upper limit, to then indicate what percentage of liability the recoveries represent, is necessary to a meaningful comparison of the Plan's allocations.

responsible for future claims as well as pending claims. Although there is no dearth of well-compensated experts willing to assume the task of predicting the future asbestos personal injury liability of companies emerging from bankruptcy—this Court heard from three very able estimation experts—the number of possible variables makes any pretense to certainty illusory. The best the Court can do is to consider the expert reports, "make reasonable adjustments based on the record created at trial and embrace the methodology it finds more reliable, while remaining vigilant to the potential bias that a party's expert may have on his or her estimation figures." *In re Federal–Mogul Global, Inc.,* 330 B.R. 133, 156 (D.Del.2005).

The Court concludes that a reasonable approximation of AWI's liability for its present and future asbestos personal injury claims is at least $3.1 billion. The Court therefore finds that the Plan does not discriminate against the Unsecured Creditors, in that their percentage recovery under the Plan is not materially less than that of the Asbestos PI Claimants.[4]

## II. FACTUAL AND PROCEDURAL HISTORY

### A. *Overview*

Armstrong World Industries, Inc.'s Chapter 11 bankruptcy and attempts at reorganization take place within the exhaustively depicted and much analyzed realm of asbestos litigation. Although the Court need not comprehensively rehearse this history, it is important to outline the environment from which this case arises. The resolution of the issue before the Court depends heavily on an understanding of the ways in which asbestos cases have historically moved through the courts.

The harmful effects of asbestos and the litigation that followed have greatly · impacted public health, the legal system, and the economy of the United States for decades. The numbers are staggering: total corporate liability is expected to surpass $200 billion, approximately 20 million workers suffered occupational exposure in the United States, approximately 250,000 people have died from the exposure, and hundreds of thousands more have exposure-based illnesses. Samuel Issacharoff & John Fabian Witt, *The Inevitability of Aggregate Settlement: An Institutional Account of American Tort Law,* 57 Vand. L.Rev. 1571, 1619 (2004) (collecting data).

Courts and counsel, both plaintiffs' and defendants', have struggled to create mechanisms to contain the asbestos litigation that has swamped the legal system—with varying degrees of success. *See In re Combustion Engineering, Inc.,* 391 F.3d 190, 200–01 (3d Cir.2004) (stating that global settlement class actions have not succeeded); Issacharoff & Witt, *Aggregate Settlement,* 57 Vand. L.Rev. at 1620–31 (discussing concentration and specialization of claims). Given the inability of the courts to cope with the large number of claims filed, Congress has for years been contemplating the enactment of a scheme to resolve asbestos claims on a nationwide scale. *See Combustion Engineering,* 391 F.3d at 201; Alison Frankel, *Numbers Reveal Drop in Asbestos Suits,* Legal-Times.com, July 10, 2006, available at *http://www.legaltimes.com.* Numerous corporations have filed for bankruptcy. *See* Issacharoff & Witt, *Aggregate Settlement,* 57 Vand. L.Rev. at 1619 (citing Deborah H. Hensler, *As Time Goes By,* 80 Tex.

---

4. This memorandum constitutes the Court's findings of fact and conclusions of law. *See* Fed. R. Bankr.P. 7052; Fed.R.Civ.P. 52.

L.Rev. 1899, 1899 (2001) ("As a result of [asbestos litigation], more than forty corporations have filed for insolvency or reorganization")).

The environment of asbestos litigation is on the cusp of major change. Although there is much disagreement about the quantity of liability that asbestos corporations will face in the future, there is widespread acknowledgment that the legal landscape has altered since the 1990s. This shift is due to many factors, including the aging of the exposed asbestos population, state tort reform, the recognition of problems with the mechanisms used to resolve large numbers of asbestos cases through the 1990s, the discovery of widespread fraud in the medical diagnoses of silicosis,[5] and the development of new litigation strategies by corporations beginning to emerge from bankruptcy. *See* Frankel, *Numbers Reveal Drop in Asbestos Suits* (discussing decline in asbestos case filings of unimpaired claims since 2003); *House Panel Reviews Mass Tort Screenings with Testimony from State Medical Officials,* 74 Law Week 2751 (House panel conducting its third investigative hearing into whether there should be a federal standard concerning mass tort medical screenings); Shannon P. Duffy, *The Heat is On—Companies Seek Dismissal of Thousands of Asbestos Cases,* Legal Intelligencer, June 12, 2006, at 1.

Although there are clear signs that the flood of asbestos litigation may be abating, the questions of how fast and how much remain. *See* Issacharoff & Witt, *Aggregate Settlement,* 57 Vand. L.Rev. at 1621 ("An estimated 10,000 Americans still die each year from asbestos-related diseases, a

number that is expected to hold constant for the next decade."); Frankel, *Numbers Reveal Drop in Asbestos Suits* (discussing refocus of asbestos litigation from unimpaired claims to cancer and fatality cases); Pam Smith, *Asbestos Plaintiffs Win $10 Million in Punitives,* Legal Intelligencer, July 20, 2006, at 4.

Standing on the surface of these shifting sands, the Court is asked to assess AWI's present and future asbestos-related personal injury liability.

### B. *AWI and Asbestos Personal Injury Litigation*

Armstrong was founded in 1860 as a cork cutting business, and was incorporated in 1891. The company expanded to encompass products in addition to cork, such as brick, linoleum, and fiberboard. Armstrong was involved in insulation contracting since the early twentieth century. Most of the asbestos personal injury claims asserted against AWI derive from AWI's involvement in the installation of high temperature insulation. In 1958, AWI spun off its contracting business, which encompassed the insulation installation, into a wholly owned subsidiary named Armstrong Contracting and Supply Corporation ("Armstrong Contracting"). In 1969, AWI sold Armstrong Contracting, which became ACandS, Inc. AWI assigned certain trade names to ACandS in connection with the sale.[6]

The first asbestos-related personal injury suit against AWI was filed in 1969. Claims against AWI in the next few decades included claims holding AWI respon-

---

**5.** *See* 5/25/06 PM Tr. 72 (Brickman); Brickman Report (UCC Ex. 50) at 39–40 (discussing U.S. District Court Judge Janis Jack's findings regarding fraudulent silica litigation in *In re Silica Products Liability Litigation,* 398 F.Supp.2d 563 (S.D.Tex.2005)).

**6.** On September 19, 2002, ACandS voluntarily filed for bankruptcy under Chapter 11. AWI Memo of Law at 6 n. 4.

sible for the contracting activities of Armstrong Contracting, although Armstrong Contracting was a legally distinct subsidiary after 1958, and a completely separate company after 1969. For a variety of reasons, AWI was unsuccessful using the defense that it was not liable for the post–1958 activities of Armstrong Contracting. Official Committee of Asbestos Claimants' ("ACC") and the Legal Representative for Future Asbestos Claimants' Joint Pre–Hearing Brief in Support of Plan Confirmation ("ACC Brief in Support") at 11; Pre–Hearing Brief of the Official Committee of Unsecured Creditors of Armstrong World Industries, Inc., et al., Opposing Confirmation of the Fourth Amended Plan of Reorganization, As Modified ("UCC Brief in Opposition") at 20.

In the mid–1980s, AWI joined the Asbestos Claims Facility ("ACF"), a group of similarly situated corporations coordinating their defense against asbestos-related personal injury cases. The ACF was disbanded in 1988, and AWI then became a member of the Center for Claims Resolution ("CCR"). The CCR was also a consortium of similar corporations that managed defense and negotiated settlements for its members for asbestos-related personal injury claims. AWI Memo in Support at 8; ACC Brief in Support at 14.

The parties dispute the value of membership in the CCR for AWI; the Plan Proponents contend that settling claims as part of a group gave each member more leverage than it would have had individually, and resulted in a reduction of defense costs for AWI from what defense costs would have been had AWI litigated these cases on its own. AWI Memo in Support at 8; ACC Brief in Support at 14. The UCC argues that the group litigation strategy of the CCR "made a bad problem worse," by accepting minimal information from claimants to prove asbestos claims in order to settle claims as quickly as possible. The UCC describes CCR, and AWI, as a part of CCR, as "claims magnets." UCC Brief in Opposition at 40. AWI remained a member of the CCR until December 6, 2000, when AWI declared bankruptcy.[7]

### C. *AWI's Bankruptcy*

AWI filed a voluntary Chapter 11 bankruptcy petition on December 6, 2000, in the United States Bankruptcy Court for the District of Delaware. Although AWI's primary place of business is Pennsylvania, it is incorporated in Delaware and therefore eligible to file for bankruptcy protection in the district of Delaware.

The case was originally assigned to the Honorable Joseph J. Farnan, Jr., of the United States District Court for the District of Delaware. At the time of the filing, the district court had withdrawn the reference for all Chapter 11 cases filed in the district. In the fourth quarter of 2001, the Third Circuit named the Honorable Alfred M. Wolin of the United States District Court for the District of New Jersey to sit by designation on the case, as well as on four other asbestos bankruptcies also pending in the district of Delaware. In turn, Judge Wolin referred the case to the Honorable Randall J. Newsome of the United States Bankruptcy Court for the Northern District of California, also sitting by designation. On June 16, 2004, the case was assigned to the undersigned.

After considerable legal maneuvering, AWI filed its Fourth Amended Plan of Reorganization on May 23, 2003. The UCC filed timely objections to the Plan, arguing that: (1) the Plan should not be approved until Congress resolved the Fairness in Asbestos Injury Resolution Act

---

7. The CCR disbanded in 2001.

("FAIR"); and (2) the Plan violated Section 1129(b) and the "best interests" test of Section 1129(a)(7) of the Bankruptcy Code.[8] The Bankruptcy Court held a confirmation hearing on November 17 and 18, 2003.[9] On December 19, 2003, the Bankruptcy Court issued Proposed Findings of Fact and Conclusions of Law and a Proposed Confirmation Order. The UCC filed timely objections, and AWI, the Asbestos PI Claimants, and the Future Claimants' Representative filed a joint response.

On December 15, 2004, this Court held a hearing to consider the objections, and on February 23, 2005, issued a decision denying confirmation of the Plan.

### D. *The Court's February 23, 2005 Denial of Confirmation*

The Court denied confirmation of the Plan based on its findings that the UCC did not waive its right to object to the Plan distributions, and that the distribution of warrants to the class of Equity Interest Holders, a class that was junior to the objecting Unsecured Creditors, violated the absolute priority rule embodied in 11 U.S.C. § 1129(b)(2)(B)(ii).[10] On December 29, 2005, the Third Circuit affirmed the Court's Order, also concluding that the proposed Plan violated the absolute priority rule.

### E. *The Modified Fourth Amended Plan of Reorganization*

On February 21, 2006, in accordance with the Court's Case Management Order, entered February 8, 2006, AWI filed a Modified Plan with the Bankruptcy Court. The Modified Plan (hereinafter the "Plan") addressed the Court's denial of confirmation by eliminating the issuance of war-

8. The Court addressed AWI's bankruptcy, the Fourth Amended Plan of Reorganization, the confirmation process, and the UCC's objections in detail in *In re Armstrong World Industries*, 320 B.R. 523, 526–531 (D.Del.2005).

9. In *In re Armstrong*, 320 B.R. at 530 n. 17, the Court notes some troubling issues surrounding the confirmation hearing, including the fact that the Bankruptcy Court conducted the hearing sitting alone although this appeared to be contrary to an agreement of the parties and the consent of the Bankruptcy and District Court; the striking of the UCC's rebuttal report without the application of the factors in *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir.1977), *overruled on other grounds, Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985) or a hearing in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and the allowance of testimony that should have been excluded in light of the Bankruptcy Court's earlier rulings.

10. 11 U.S.C. § 1129(b) provides, in relevant part:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

. . .

(B) With respect to a class of unsecured claims—

. . .

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

rants to the class of Equity Interest Holders.[11] The only outstanding objection to the Plan is the UCC's objection that the Plan unfairly discriminates pursuant to 11 U.S.C. § 1129(b).[12] Prior to the hearing on the Plan, the parties submitted proposed Stipulated Findings of Fact and Conclusions of Law Regarding Confirmation of the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc., as Modified, agreeing that the Plan met all of the requirements of 11 U.S.C. §§ 1129(a) and (b) except for the UCC's unfair discrimination objection. It is this issue that is before the Court.[13]

---

**11.** In addition, the Modified Plan: (1) updates the Amended and Restated Articles of Incorporation and the Amended and Restated By–Laws to reflect the passage of time and certain modifications to Pennsylvania law; (2) updates the list identifying the proposed Board of Directors of Reorganized AWI; and (3) updates the schedules of executory contracts annexed to the Plan. Stipulated Findings of Fact and Conclusions of Law Regarding Confirmation of the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc., As Modified ("Stipulations") at 24–25. The parties represent in their Stipulations that these modifications "do not adversely affect the Claim of any creditor who has not accepted in writing such modifications." *Id.* at 25.

**12.** The UCC reserved the right to request suspension of the Confirmation Hearing or the denial of the Plan based upon the likelihood of passage of the Fairness in Asbestos Injury Resolution Act. As of the date of this opinion, the bill embodying the proposed act is still pending before the Senate Judiciary Committee.

**13.** The Court held a hearing on May 23, 24, and 25, 2006. Subsequent to the hearing, the parties submitted proposed findings of fact and conclusions of law. Closing arguments were heard on July 11, 2006. After closing arguments, the parties submitted final briefs.

**14.** 28 U.S.C § 1334 provides, in relevant part:
(a) Except as provided in subsection (b) of this section, the district courts shall have

## III. LEGAL STANDARDS

### A. *Jurisdiction*

In its Case Management Order of February 8, 2006, the Court provided that it would preside over the Confirmation Hearing regarding the Plan. The Court has jurisdiction over the confirmation of the Plan pursuant to 28 U.S.C. § 157 and § 1334.[14]

### B. Confirmation of a Reorganization Plan Under 11 U.S.C. § *1129*

To confirm the Plan, the Court must determine whether it meets the specific

---

original and exclusive jurisdiction of all cases under title 11.
(b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
28 U.S.C. § 157 provides, in relevant part:
(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.
(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
. . .
(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

requirements of Section 1129. The Plan Opponents assert that it does not. To satisfy the requirements of § 1129(a), all impaired classes must accept the Plan. Section 1129(b) allows the confirmation of a plan over the objection of an impaired class if the "plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

A reorganization plan confirmed pursuant to § 1129(b) is referred to as a "cramdown." A cramdown may be necessary under certain circumstances to foreclose the possibility that a small minority would prevent confirmation of the plan. *In re Armstrong World Industries*, 320 B.R. at 532.

■ In the context of a cramdown, the debtor's standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence. *In the Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1165 (5th Cir.1993); *Corestates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 45 (E.D.Pa. 1996) (holding "a debtor need only prove the feasibility of its plan by a preponderance of the evidence 'which is the appropriate standard of proof under both § 1129(a) and in a cram down',") (citing *Briscoe*, 994 F.2d at 1165).[15] Here, the UCC, an impaired class, objects that the proposed Plan unfairly discriminates against its members, in violation of § 1129(b).[16]

**15.** Contrary to the Plan Opponents' assertion, the clear and convincing standard of proof is not applicable here. Although the Third Circuit has not ruled on the proper standard, other courts, including the Fifth Circuit, have distinguished between objections by unsecured creditors and secured creditors when confirming a plan pursuant to a cramdown. So long as the proposed plan complies with § 1129 of the Bankruptcy Code by a preponderance of the evidence, a cramdown may be confirmed over the objection of *unsecured* creditors. *See In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1165 (5th Cir.1993), cert. denied, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n. 23 (Bankr.D.Del.2001); *In re Byrd Foods, Inc.* 253 B.R. 196, 199 (Bankr.E.D.Va.2000). *See also In re Deluca*, 1996 WL 910908 at *18, 1996 Bankr.LEXIS 1950 at *50–51 (Bankr.E.D.Va. Apr. 12, 1996) (noting that "where the Bankruptcy Code is silent on the standard of proof, such silence is 'inconsistent with the view that Congress intended to require a special, heightened standard of proof.' ") (citing *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

The cases cited by the Plan Opponents are inapposite in that they pertain to objections by secured creditors in a cramdown confirmation. *See, e.g., Federal Home Loan Mortgage Corp. v. Bugg*, 172 B.R. 781, 784–85

(E.D.Pa.1994) (applying clear and convincing standard in the case of a cramdown confirmation over the objection of a secured creditor); *United States v. Woodway Stone Co.*, 187 B.R. 916, 918 (W.D.Va.1995) (same). It appears that some courts have applied this raised evidentiary standard for the benefit of secured creditors, finding that secured creditors have a greater interest in the property of the debtor than do unsecured creditors. *See* "secured creditor" and "unsecured creditor" in Black's Law Dictionary 376 (7th ed.1999). *See also In re Briscoe*, 994 F.2d at 1164 (noting the clear and convincing standard is typically employed in cases when the "interests at stake are deemed to be more substantial than the mere loss of money.") (citing *Addington v. Texas*, 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). *See also In re: Arnold and Baker Farms* 177 B.R. 648, 654–655 (9th Cir.BAP1994) (ultimately concluding that preponderance of the evidence is the appropriate standard of proof in a cramdown over unsecured creditors under § 1129(b)). (citing *In re Briscoe* 994 F.2d 1160, 1165). Given that the instant case does not involve an objection by secured creditors, the Court need not address whether the elevated standard of proof is applicable in such cases.

**16.** There is no dispute that the UCC's objection is the sole dissent to the confirmation of the Plan.

## C. *Unfair Discrimination*

■ Unfair discrimination is not defined in the Bankruptcy Code, nor does the statute's legislative history provide guidance as to its interpretation. *In the Matter of Johns–Manville Corp.,* 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986). "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *Id.* The pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is "unfair." *In re Jim Beck, Inc.,* 214 B.R. 305, 307 (W.D.VA.1997).

Courts have developed several methods to determine whether a proposed plan unfairly discriminates against a dissenting class. "The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination." *In the Matter of Lernout & Hauspie Speech Products, N.V.,* 301 B.R. 651, 660 (Bankr.D.Del.2003).

Traditionally, courts applied a four-factor test to determine unfair discrimination. The factors considered are:

(1) whether the discrimination is supported by a reasonable basis;

(2) whether the debtor could consummate the plan without the discrimination;

(3) whether the discrimination is proposed in good faith; and

(4) the relationship between the discrimination and its basis or rationale.

*In re Ambanc La Mesa Limited Partnership,* 115 F.3d 650, 656 (9th Cir.1997); *In re Dow Corning Corp.,* 244 B.R. 696, 700 n. 3 (Bankr.E.D.Mich.1999) (listing cases applying four-factor test). In *Dow Corning,* the bankruptcy court in the Eastern District of Michigan noted that some courts had pared the four-factor test down to two factors: (1) whether the discrimination is supported by a legally acceptable rationale; and (2) whether the discrimination is necessary "in light of the rationale." 244 B.R. at 701 n. 5 (internal citation omitted).

■ More recently, several courts have replaced the four-factor test with a rebuttable presumption test, first proposed in an article by Professor Bruce A. Markell in the American Bankruptcy Law Journal. *See Dow Corning,* 244 B.R. at 701 (citing Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11,* 72 Am. Bankr.L.J. 227 (1998)). In this analysis, a rebuttable presumption of unfair discrimination arises when there is:

(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Dow Corning,* 244 B.R. at 702.

■ If there is an allegation of a materially lower percentage recovery, the presumption can be rebutted "by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain." *Id.* A demonstration that the risk allocation was similar to the risk assumed by the parties prior to bankruptcy can rebut the presumption that a discriminatory risk allocation was unfair. *Id.*

The bankruptcy court in *Dow Corning* found Professor Markell's test to more

effectively target unfair discrimination than did the four-factor test, and therefore adopted and applied the rebuttable presumption standard. *Id. Also see In the Matter of Greate Bay Hotel & Casino. Inc.,* 251 B.R. 213, 231 (Bankr.D.N.J.2000) (adopting rebuttable presumption test); *In the Matter of Lernout & Hauspie,* 301 B.R. at 661 (explaining rebuttable presumption test).

Although the Third Circuit has not yet discussed what standard should apply when assessing unfair discrimination, the parties agree the Markell test should be applied in the instant case. The Court agrees and will apply the Markell test.

■ Applying the Markell test to this case, the Plan Proponents bear the burden of establishing that the Plan comports with § 1129's requirements by a preponderance of the evidence. The UCC, as dissenters, bear the burden of producing evidence to support their objection. *In the Matter of Lernout & Hauspie,* 301 B.R. at 656. The UCC has timely raised its objection to the Plan. Consequently, the Plan Proponents must now prove, by a preponderance of the evidence, that the Plan does not unfairly discriminate. *See In re 222 Liberty Assoc.,* 108 B.R. 971, 991 (Bankr.E.D.Pa. 1990); *In re Colfer,* 159 B.R. 602, 608 (Bankr.D.Me.1993).

■ The Court need only reach the question of whether the discrimination is unfair and utilize the rebuttable presumption test if it first finds that the Plan discriminates at all. *See Dow Corning,* 244 B.R. at 703 (holding a presumption of unfairness only arises if the proposed plan provides for "either a materially lower recovery or a greater allocation of risk" for the dissenters). A finding that all classes of the same priority will receive the identi-

cal amount under the proposed Plan is not necessary to find that the Plan does not discriminate. *See In re Colfer,* 159 B.R. at 606 (stating "different treatment may or may not constitute unequal treatment, let alone unfair discrimination"). And under the Markell test, the presumption of unfair discrimination only arises if the dissenting class would receive a "materially lower" percentage recovery or will have a "materially greater risk" in connection with the distribution. *See In the Matter of Greate Bay Hotel,* 251 B.R. at 231 (noting that "[c]ourts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment (50% or more) to similarly situated creditors.").

Under the circumstances of this case, the Court must decide whether the amount designated for the Unsecured Creditors is a materially lower recovery than that designated for the Asbestos PI Claimants. If the Court finds that $3.1 billion is a reasonable approximation of the liability for present and future personal injury claims, then the Unsecured Creditors, receiving an approximate 59.5% recovery for each claim, are not receiving a materially lower percentage recovery than the Asbestos PI Claimants. If the Court finds the liability for present and future personal injury claims is less than $3.1 billion, a rebuttable presumption of unfair discrimination arises. The Court must then assess whether the Plan Proponents have rebutted this presumption of unfairness.

The Court must compare the proposed allocations to the Asbestos PI Claimants and the Unsecured Creditors to determine whether the Plan unfairly discriminates against the UCC. The Court need not "pick a number," as in an estimation hearing, to make such a comparison.[17] Howev-

17. The Official Committee of Unsecured Cred-    itors asserts that "[t]esting for unfair discrimi-

er, because the Court must determine whether $3.1 billion is a reasonable estimate of the asbestos personal injury liability to make this comparison, the Court's inquiry must be informed by the principles of estimation.

### D. The Principles of Estimation

■■■ The Bankruptcy Code provides:

There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

(2) any right to payment arising from a right to an equitable remedy for breach of performance

11 U.S.C. § 502(c). The Code does not provide a roadmap for estimation. *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir.1982). "The principal consideration," in an estimation proceeding, "must be an accommodation to the underlying purposes of the Code." *Id.* The only requirement is that the value of the claim be determined in accordance with the legal rules that will govern the final amount of the claim, and "there are no other limitations on the court's authority to evaluate

the claim save those · general principles which should inform all decisions made pursuant to the Code." *Id.* at 136.

■■■ . Because asbestos claims arise under state law, the claims must be valued in accordance with substantive state tort law. *See Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) (holding "[t]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims, … Congress having· 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.' ") (internal citations omitted); *Owens Corning*, 322 B.R. at 721. A court must therefore look at how a claim would have been valued in the state court system had the debtor never entered bankruptcy. *Id.* at 722. Additionally, claims are to be valued as of the petition date. *Id.; Federal–Mogul*, 330 B.R. at 155.

While the parties generally agree on the principles laid out in the preceding paragraph, Post–Trial Brief of Armstrong World Industries, Inc., the Official Committee of Asbestos Claimants, and the Legal Representative for Future Asbestos Claimants ("Proponents' Post–Trial Brief") at 14–15; UCC Post–Hearing Brief at 7, they emphasize slightly different methodology. On the one hand, the Plan Propo-

nation of necessity" involves the Court picking a number for asbestos personal injury liability, and that it is "axiomatic" that the Plan Proponents must prove what each class will receive under the Plan to show the Unsecured Creditors are not receiving a greater percentage recovery than the Asbestos PI Claimants. *Post–Hearing Brief of the Official Committee of Unsecured Creditors of Armstrong World Industries, Inc., et al.* ("UCC Post–Hearing Brief") at 2, 9. The Court is not so sure. Indeed, courts interpreting the unfair discrimination provision of the Code appear to look generally at the treatment classes will receive under the proposed plan, not at the specific amount the classes will receive. *See, e.g. In the Matter of Lernout & Hauspie*

*Speech Products, N.V.,* 301 B.R. 651, 661–62 (Bankr.D.Del.2003) (finding no discrimination when all claims in same class will be treated similarly); *In the Matter of Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 231–32 (Bankr.D.N.J.2000) (stating actual value to be received by dissenting class "cannot be calculated with precision"; court concluded it would not receive a materially lower percentage recovery than general unsecured creditors); *In re Dow Corning Corp.,* 244 B.R. 696, 703 (Bankr.E.D.Mich.1999) (holding that dissenting class' failure to designate a comparable class in unfair discrimination inquiry did not prevent court from finding dissenting class was not receiving a materially lower percentage recovery than other classes).

nents emphasize in their briefs that "the best predictor of the number and value of pending and future asbestos claims is the debtor's actual historical experience in the tort system," Proponents' Post–Trial Brief at 15. By contrast, the Opponents caution that the debtor "cannot satisfy its burden [of proof] by merely rolling forward its historical asbestos claims experience to estimate its future liability." UCC Post–Hearing Brief at 7. The two stances, a focus on the debtor's history by the Plan Proponents, and a recognition of changed circumstances by the Plan Opponents, are, however, reconcilable.

While it is true that "[t]o attempt an estimation without utilizing information known about these debtors and their history in the handling of claims which have been asserted against them in the past, and their disposition, is to ignore a valuable resource," *Federal–Mogul,* 330 B.R. at 157, it is also true that "adjustments should be made to historical values to account for ... probable changes." *Owens Corning,* 322 B.R. at 723. The challenge is to strike the proper balance between the two—the debtor's history and the probable changes in the litigation landscape—while keeping in mind the uncertainty of predicting how future claims would be resolved.

The Court recognizes that "we are dealing with uncertainties, and are attempting to make predictions which are themselves based upon predictions and assumptions," *Owens Corning v. Credit Suisse First Boston,* 322 B.R. 719, 721 (D.Del.2005). Therefore, the Court will not seek to analyze the estimations before it for mathematical precision, nor will it attempt to reach its own exact number. *See In re Federal–Mogul Global, Inc., T & N Limited, et al.,* 330 B.R. 133, 155 (D.Del.2005) ("an estimation by definition, is an approximation and necessarily involves comparing a known or established quantum of data to

the thing being estimated."); *Owens Corning,* 322 B.R. at 725 ("since mathematical precision cannot be achieved in the prediction being undertaken, it is important that we not pretend to have achieved mathematical accuracy."). Rather, the Court's task will be to assess the parties' experts' estimations of the pending and future asbestos personal injury liability, and determine how well these estimations incorporate historical factors and account for changed circumstances in the asbestos litigation environment.

The resolution of the issue before the Court, therefore, boils down to the following: If the Court, using the principles of estimation, finds that the Plan Proponents have shown by a preponderance of the evidence that an allocation of $3.1 billion for personal injury claimant liability is a reasonable approximation of the amount of liability, the Plan does not result in a materially lower recovery for the Unsecured Creditors, and there is no discrimination. Such a finding would result in the confirmation of the Plan. If the Court finds the allocation of $3.1 billion is not a reasonable approximation, and the Unsecured Creditors will therefore receive a materially lower recovery than will the personal injury claimants, it must then assess whether the Plan Proponents have rebutted the presumption of unfairness. If they have, the Plan will be confirmed, if they have not, the parties head back to the drawing board.

■ For the reasons explained below, the Court finds the Plan Proponents have met their burden of showing that $3.1 billion is a reasonable approximation of the liability the debtor will face for present and future asbestos personal injury claims. It follows then that because the Court has determined that no discrimination exists, it need not reach the issue of whether the discrimination is unfair.

## IV. EVIDENCE ADDUCED BY THE PARTIES

During the hearing, the Court heard live testimony from Daniel Myer, Edward Houff, Dr. Laura Welch, Dr. Hans Weill, Dr. Mark Peterson, Dr. B. Thomas Florence, Dr. Letitia Chambers, and Professor Lester Brickman.[18] In addition, the parties designated deposition testimony from Lawrence Keating, William Hanlon, Paul Hanly, and William Rodruan, subject to objections taken at the time of testimony. The parties also designated deposition testimony of Mr. Hanlon and Mr. Hanly's trial testimony from a prior Chapter 11 case, *In re Federal–Mogul,* 330 B.R. 133 (D.Del.2005).[19]

Myer, Houff, Keating, Hanlon, Hanly, and Rodruan testified as fact witnesses. Myer is a former claims settlement negotiator for the CCR; Houff was one of AWI's principal outside defense counsel for asbestos-related personal injury claims during 1980—2000; Keating was AWI's in-house counsel with principal responsibility for asbestos personal injury litigation from 1978—1998; Hanlon is the Special Counsel to the CCR and has worked as outside counsel for the CCR since 1989; Hanly is the former national defense counsel for Turner & Newall, Ltd. ("T & N"), a major asbestos defendant; and Rodruan has been the Vice President and Controller of AWI since 1999.

Dr. Welch and Dr. Weill were qualified as medical experts, Dr. Welch for the Plan Proponents, and Dr. Weill for the Plan Opponents. Dr. Peterson, Dr. Florence, and Dr. Chambers were designated as experts in the field of asbestos personal injury claims estimation, Dr. Peterson for the ACC, Dr. Florence for the Asbestos PI Claimants, and Dr. Chambers for the UCC. Dr. Brickman was qualified by the Court as an expert in the history of asbestos litigation, asbestos claims, settlement practice, bankruptcy trusts, and the effects of changes in distribution on asbestos claiming activity.

Given that the ultimate resolution to the issue before the Court turns on an analysis of the positions advanced by the various estimation experts heard by the Court, i.e., a battle of the experts, a detailed survey and discussion of these expert opinions is essential.

### A. Dr. Mark Peterson

Dr. Peterson is a lawyer who also holds a doctorate in experimental social psychology and who has researched mass tort litigation since the early 1980s. 5/23/06 PM Tr. 113. He was offered as an expert by the Plan Proponents. Dr. Peterson has been qualified as an expert on the valuation of asbestos personal injury liability in many asbestos bankruptcy proceedings, as well as in other contexts. 5/23/06 PM Tr. 113–19. *See, e.g. In re Federal–Mogul, Inc.,* 330 B.R. 133, 158 (D.Del.2005); *In re National Gypsum Co.,* 257 B.R. 184, 199 (Bankr.N.D.Tex.2000); *In re Eagle–Picher*

---

18. After consultation with the parties and review of the submissions made, the Court imposed reasonable time limits on the hearing. The Third Circuit recognized in *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604 (3d Cir.1995), the ability of a district court to impose time limits on parties' trial presentations.

19. Applying the teachings of the Third Circuit case *Meyers v. Pennypack,* 559 F.2d 894, on excluding expert testimony, the Court excluded testimony of Dr. Robin Cantor, an expert witness for the UCC. 5/25/06 PM Tr. 8–10. The Court found the movant designated the testimony of the expert beyond the deadline set by the Court, no adequate rationale was given for this late designation, and that the admission of the testimony would have prejudiced the non-moving parties and interfered with the orderly and efficient trial of this case. 5/25/06 PM Tr. 8–9.

*Indus., Inc.,* 189 B.R. 681, 686 (Bankr. S.D.Ohio 1995).

Dr. Peterson estimated AWI's liability for pending claims to be $758 million, and AWI's liability for future claims to be $5.363 billion, using the parties' agreed upon discount rate of 5.55%.[20] Dr. Peterson's total liability estimate for AWI's asbestos personal injury claims, therefore, is $6.121 billion. Peterson Report (PS Ex. 57) at 43 (table 23); 5/24/06 AM Tr. 46.

To determine the liability for pending claims, Dr. Peterson first determined the number of pending claims for each disease category—mesothelioma, lung cancer, other cancer, and nonmalignant claims—from the CCR database. Peterson Report (PS Ex. 57) at 5–9. Dr. Peterson eliminated duplicate claims and imputed missing information for claims missing information. Peterson Report (PS Ex. 57) at 8. Next, Dr. Peterson determined the average settlement amounts for these claims by looking at AWI's average settlement amount for each of the disease categories from 1990–2000. Peterson Report (PS Ex. 57) at 7 (Table 1). Taking the amount by which the average settlement values had increased from 1999 to 2000, Dr. Peterson assumed the settlement values would increase by the same percentage from 2000 to 2001, but would remain at that level except for inflation. Peterson Report (PS Ex. 57) at 21 (Table 11).

The Plan Opponents argue that 2000 was an anomalous year for several reasons: (1) GAF Corporation, a CCR member, withdrew from the CCR, inflating the settlement values of the other members; (2) inexperienced defendants entered asbestos litigation and inflated settlement values; and (3) many of the mesothelioma claims that year were filed and settled in state fora which were unfavorable to defendants. UCC Post–Hearing Brief at 67. Because of the inflated weight Dr. Peterson's method gives to the potentially anomalous settlement values of the year 2000, the Court agrees that the use of an average, as was done in Drs. Florence and Chambers' estimates, is a more reliable methodology.

Dr. Peterson assumed that in the future, AWI would pay 70% of cancer claims, and 60% of nonmalignant claims. Peterson Report (PS Ex. 57) at 19, 20 (Table 9). Multiplying the number of pending claims by his average resolution value, taking into account his assumed compensability percentage, and reducing the number by the discount rate, Dr. Peterson reached a present value of $758 million for AWI's pending asbestos personal injury claims. Peterson Report (PS Ex. 57) at 43 (Table 23); 5/24/06 PM Tr. 46.

To forecast the number of future asbestos personal injury claims against AWI, Dr. Peterson utilized the Nicholson Study, a report by William J. Nicholson, et al., titled *Occupational Exposure to Asbestos: Population at Risk and Projected Mortality—1980–2030,* 3 American Journal of Industrial Medicine 259 (1982), which attempted to predict the number of people who would get asbestos related cancer until 2030. *Federal–Mogul,* 330 B.R. at 139 n. 5; Peterson Report (PS Ex. 57) at 24–26. The Nicholson Study has been shown to be remarkably accurate over time, in that its predictions have been compared to a national registry, called the Surveyance of End Epidemiological Results, run by the National Cancer Institute. 5/23/06 PM Tr. 52.

---

**20.** Because payments to resolve claims would be made over a span of years, the total amount to be paid must be discounted to present value. The parties have agreed that the appropriate discount rate is 5.55%. 5/24/06 AM Tr. 44 (Peterson); 5/24/06 PM Tr. 37 (Florence); 5/25/06 AM Tr. 59 (Chambers).

Because not every person with a newly diagnosed cancer would sue AWI, Dr. Peterson also calculated a "propensity to sue" number. Taking into account historical propensity to sue numbers, and looking at the propensity to sue numbers that the Manville Trust[21] has experienced, Dr. Peterson predicted that the propensity to sue would increase until 2005 and then remain constant. Peterson Report (PS Ex. 57) at 35 (Table 17), 36 (Figure 18).

There are no studies similar to the Nicholson Study to predict the future occurrence of nonmalignant diseases related to asbestos. Peterson Report (PS Ex. 57) at 37; 5/23/06 PM Tr. 70–71 (Welch); 5/25/06 AM Tr. 21 (Weill). Instead, predictions have been predicated on a relatively stable correlation between the number of cancer claims and the number of nonmalignant claims. Peterson Report (PS Ex. 57) at 37–39. Because of changes in the litigation environment, however, Dr. Peterson forecast a decline in nonmalignant filings from their 2000 levels. Peterson Report (PS Ex. 57) at 41 (Figure 22).

Using the above methodologies, Dr. Peterson predicted a total of 880, 615 future claims, with a total of 538,666 of these claims as compensable (assuming a compensability rate of 70% for all cancer claims and 60% for nonmalignant claims).

Peterson Report (PS Ex. 57) at 41 (Table 19), 20 (Table 9). Dr. Peterson used the same settlement values he used for pending claims, adjusting them for inflation at a rate of 2.5% annually. Peterson Report (PS Ex. 57) at 41. Reaching a total number of $11.466 billion in future asbestos personal injury claims, and discounting it to present value by 5.55%, Dr. Peterson's estimate of future personal injury liability for AWI is $5.363 billion. When added to his estimate for pending claims, Dr. Peterson estimated AWI's total asbestos personal injury liability at $6.121 billion. Peterson Report (PS Ex. 57) at 43 (Table 23).[22]

### B. *Dr. B. Thomas Florence*

Dr. Florence holds a Ph.D. in research design and statistics and has done analysis and consulting work in the mass tort area for more than seventeen years. 5/24/06 AM Tr. 125. He was offered as an expert by the Plan Proponents. He has been retained to prepare estimation calculations in multiple asbestos bankruptcies, and has been qualified as an expert on asbestos claims estimation by numerous courts. 5/24/06 PM Tr. 6–7.

Dr. Florence calculated 32 different estimates for AWI's total asbestos personal injury liability, using various assumptions, and reached a median range of $4.5 billion.

---

**21.** The Johns–Manville Corporation ("Manville") was a principal producer of asbestos products. Manville filed for bankruptcy in 1982. The bankruptcy led ultimately to the formation of the Manville Personal Injury Settlement Trust (the "Manville Trust") to pay the company's asbestos-related liability. Chambers Report (Ex. 51), at 6. Because the Manville Trust has maintained thorough records through the years, and because a large majority of asbestos claimants file claims against the Manville Trust, the Manville Trust Claims Database is widely accepted as a reliable source of asbestos claims data. Chambers Report (Ex. 51), at 13; Peterson Report (PS Ex. 57) at 8.

**22.** Dr. Peterson did numerous sensitivity analyses, in which he adjusted his total estimate by changing certain of his assumptions. 5/24/06 AM Tr. 49–51. For example: (1) if the average of 1999 and 2000 settlement accounts were used instead of increasing the settlement amount by the percentage the settlement amount increased from 1999 to 2000, the total would be $4.052 billion. 5/24/06 AM Tr. 50; (2) if 2000 settlement amounts were used, the total would be $4.9 billion. 5/24/06 AM Tr. 51; and (3) if propensities to sue were held at 2000 levels, instead of increased, the total would be $5.248 billion. Peterson Report (PS Ex. 57) at 49 (Table 28).

5/24/06 PM Tr. 37; Florence Report (PS Ex. 72) at 3.

As did Dr. Peterson, Dr. Florence first calculated the number of pending asbestos personal injury claims against AWI, also imputing missing information. 5/24/06 PM Tr. 17–18; Florence Report (PS Ex. 72) at 4. Dr. Florence calculated there to be 141,-526 pending claims, including mesothelioma, lung cancer, other cancer, and nonmalignant claims. 5/24/06 PM Tr. 21; Florence Report (PS Ex. 72) at 18.[23]

To determine the number of future asbestos personal injury claims against AWI, Dr. Florence used two epidemiological models: the Nicholson Study, with revisions done by the KPMG Peat Marwick Policy Economics Group in 1991,[24] and Peto/ARPC.[25] Unlike the Nicholson Study, which looks at eleven major industry and occupation groups having occupational exposure to asbestos between 1940 and 1980, the Peto/ARPC method focuses solely on AWI claimants—it uses AWI's historical filings to calculate the population of people exposed to products for which AWI may have asbestos liability and is then used to forecast the number of exposed workers that will contract mesothelioma and lung cancer in the future. 5/24/06 PM Tr. 25–26; Florence Report (PS Ex. 72) at 15.

Relying on the Nicholson study, Dr. Florence calculated a "propensity to sue" number. He divided AWI's historical mesothelioma and lung cancer claims over a certain time period by the overall national incidence of these diseases as predicted by the Nicholson Study over the same time periods. 5/24/06 PM Tr. 22–23. Dr. Florence used four different time periods— 1996–2000, 1997–2000, 1998–2000, and 1999–2000 in order to try to take any year-specific anomalies into account. 5/24/06 PM Tr. 23–24. Dr. Florence assumes the propensity to sue will remain constant in the future. 5/24/06 PM Tr. 25.

To estimate the number of future other cancer and nonmalignant claims, Dr. Florence used two methods: (1) he calculated AWI's historic ratio of other cancer and nonmalignant claims to lung cancer claims; and (2) he used regression models to estimate the number of other cancer and nonmalignant claims from lung cancer claims. 5/24/06 PM Tr. 27; Florence Report (PS Ex. 72) at 17. Dr. Florence assumed that the ratio would stay constant into the future, unlike Dr. Peterson, who forecast a decline in the ratio. The Court finds Dr. Peterson's method more reliable than Dr. Florence's because Dr. Florence's approach does not take the changed litigation environment into account. As noted above, nonmalignant claims are declining. Alison Frankel, *Numbers Reveal Drop in Asbestos Suits,* LegalTimes.com, July 10, 2006, available at *http://www.legaltimes.com.* The median number of Dr. Florence's 32 forecasts for future claims is

---

**23.** This estimate of pending claims is substantially similar to Dr. Peterson's, which is 141,-175 claims, and close to Dr. Chambers' estimate of 147,683 claims.

**24.** In his report, Dr. Florence indicates that except for the adoption of the Occupational Safety and Health Administration (OSHA) 1986 dose-response models for mesothelioma and lung cancer, the revisions made are refinements to the data, not changes to the structure of the model itself. Florence Report (PS Ex. 72) at 13.

**25.** The Peto/ARPC method is based on the work of Peto, Henderson, and Pike. Peto, J., Henderson, B.E., & Pike, M.C. *Trends in Mesothelioma Incidence in the United States and the Forecast Epidemic Due to Asbestos Exposure During World War II,* Quantification of Occupational Cancer, Banbury Report 9, Cold Spring Harbor Laboratory, 1981, at 51–69. Florence Report (PS Ex. 72) at 12.

968,003. 5/24/06 PM Tr. 30; Florence Report (PS Ex. 72) at 18.[26]

To calculate the average settlement value for claims, Dr. Florence used AWI's average 1999–2000 average settlement values for claims that received a greater than zero payment. Florence Report (PS Ex. 72) at 19. Next, Dr. Florence calculated the average resolution value for each of the four disease categories, taking into account the claims resolved by AWI without payment. 5/24/06 PM Tr. 33–35; Florence Report (PS Ex. 72) at 20. Multiplying the number of pending claims in each disease category by the average resolution value, Dr. Florence reached a total liability for pending claims of $690 million.[27] PS Ex. 74 (Florence demonstrative, Slide 35). Although the Court agrees that using AWI's average settlement values is a reliable method, it believes a longer period provides a better range of values and better compensates for anomalies. *See Federal–Mogul,* 330 B.R. at 160 ("[U]sing more years, rather than less, is a more accurate method for forecasting a long-term average.").

**26.** Dr. Florence does not assume that all of these claims will be compensable. He incorporates the possibility that some claims will be resolved with a zero payment into his settlement value estimates. Florence Report (PS Ex. 72) at 19–21.

**27.** Dr. Peterson's estimate for pending asbestos personal injury claims against AWI is $757 million.

**28.** As did Dr. Peterson, Dr. Florence conducted several sensitivity analyses, which included the following: (1) an attempt to adjust his estimates to take into account the possible effects of changes in state tort law on nonmalignant filings, which resulted in an adjusted median forecast of $4.149 to $4.456 billion. 5/24/06 PM Tr. 43, 45; Florence Report (PS Ex. 72) at 24; (2) an adjustment incorporating the Manville Trust's experience to his predictions, which reduced the number of nonmalignant filings by 47%, which reduced his

Dr. Florence multiplied the same resolution values used for pending claims, but increased for inflation by a rate of 2.5% through 2006 and 1% yearly thereafter, with his forecasts of future claims. Adding his pending and future claims estimates together, the median came to approximately $7.5 billion. Reduced by the discount rate of 5.55%, Dr. Florence's median estimate was $4.5 billion. 5/24/06 PM Tr. 37; Florence Report (PS Ex. 72) at 22.[28]

### C. *Dr. Letitia Chambers*

Dr. Chambers, who holds a Ph.D. in educational research, has studied asbestos-related issues for almost 25 years. 5/25/06 AM Tr. 47. She was offered as an expert by the Plan Opponents. Since 2001, she has been a Managing Director of Navigant Consulting, Inc. UCC Ex. 51 at 1.

Dr. Chambers' estimate of AWI's total asbestos personal injury liability is $1.96 billion. UCC Ex. 57A. She calculated the number of pending claims against AWI to be 147,683.[29] Chambers Report (UCC Ex. 51) at 13–15.

median liability estimate to $4.165 billion. 5/24/06 PM Tr. 42–43; Florence Report. (PS Ex. 72) at 24; and (3) an analysis reflecting the upward trend in AWI's settlement averages, which Dr. Florence found could increase AWI's liability by 18% to 90%. 5/24/06 PM Tr. 44–45; Florence Report (PS Ex. 72) at 26.

**29.** Certain pending claims against AWI are missing a disease description in the database. To fill in the missing information, all of the experts first looked to see if the same claimant had filed a claim against the Manville Trust, and if so, assumed the disease description was the same. Drs. Peterson and Chambers then used the following method to allocate the remaining claims: claimants that were not found in the Manville Trust database were allocated to disease categories based on the historical distribution of closed AWI claims which had originally had an unknown disease, but for which the CCR had deter-

To predict the number of future malignant asbestos personal injury claims against AWI, Dr. Chambers starts with the Nicholson Study, as do Drs. Peterson and Florence. Dr. Chambers, however, narrows the Nicholson population of future malignant claimants by only selecting claimants who, by her analysis, worked in industries in which they could have been exposed to asbestos-containing products sold by AWI. This reduces the number of potential malignant claimants from the Nicholson Study's 27.5 million to 21.1 million people. Chambers Report (UCC Ex. 51) at 33 (Table 18).

The Court disagrees with the utility of Dr. Chambers' methodology and finds the approaches of Drs. Peterson and Florence to be more reliable. First, Dr. Chambers' methodology assumes asbestos claimants will confront a product identification requirement that is not currently the reality in asbestos litigation, and may not ever be feasible. Mr. Houff testified that, prior to AWI's bankruptcy, the lack of records regarding where AWI products were placed would create a question of fact concerning product identification, and preclude summary judgment on this issue. 5/23/06 AM Tr. 126–27. In addition, the lack of certainty surrounding the post–1957 liability of AWI also makes it difficult to predict the products for which AWI will be held liable in the future.[30] As stated by the court in *Federal–Mogul,* "the safest and surest predictor of filings must be tied to an epidemiological model that forecasts incidence of disease, and not on whether a particular claimant makes a decision to file a complaint." 330 B.R. at 160.[31]

After reducing the Nicholson Study's potential population of malignant claimants, Dr. Chambers applied a compensability rate of 67% for mesothelioma claims and 70% for lung cancer claims to this number. Chambers Report (UCC Ex. 51) at 37.[32]

Regarding nonmalignant future claims against AWI, Dr. Chambers also used a ratio of malignant claims filings to nonmalignant claims filings, as did Drs. Peterson and Florence. However, instead of looking at historic ratios between malignant and nonmalignant claims, Dr. Chambers utilizes the ratio recorded by the Manville Trust in recent years. Chambers Report (UCC Ex. 51) at 39–42. Beginning in 2003, the Manville Trust revised its trust distribution procedures ("TDPs") by imposing more rigorous medical criteria on claimants. UCC Ex. 50 at 88. The new TDPs were first fully implemented in 2004. While in 2000 the ratio of nonmalignant to malignant claims was about 9 to 1, it averaged about 2.2 to 1 in 2004 and 2005.

mined a disease. Peterson Report (PS Ex. 57) at 8; Chambers Report (UCC Ex. 51) at 14. Dr. Florence used two different methods to allocate the remaining claims: the first distributes unknowns in proportion to the claims with known diagnoses for the same year of diagnosis within its industry classification and the second uses a matrix based on the Manville Trust data. Florence Report (PS Ex. 72) at 5–6.

30. In her estimate, Dr. Chambers does recognize the legal uncertainty regarding AWI's liability for its subsidiary, ACandS, and assumes that AWI has liability for insulation exposures from 1957 to 1969, when it sold ACandS. Chambers Report (UCC Ex. 51) at

28. Dr. Chambers assumes AWI will not have liability for insulation products and installation post–1969, although this too, appears to be an open question.

31. The Court notes that the limitation of the exposed population has a relatively small effect on Dr. Chambers' final estimate. A sensitivity analysis prepared by Dr. Chambers shows that the use of the full Nicholson population results in an estimate that is $47 million higher than her estimate of $1.96 billion.

32. Dr. Chambers based the 67% and 70% compensability rates on AWI's annual compensability rates for 1997–2000. Chambers Report (UCC Ex. 51) at 37.

UCC Ex. 50 at 88. Dr. Chambers used this ratio, 2.2 to 1, to predict the number of future nonmalignant asbestos personal injury claims against AWI, and reached the conclusion that there would be 129,334 compensable future nonmalignant claims against AWI. Chambers Report (UCC Ex. 51) at 42–43.

The Plan Opponents state that it "makes good sense" to use the Manville Trust experience in 2004 and 2005 after the Trust imposed stricter medical criteria requirements because it: "reflects both (i) the changing circumstances in the state tort system, and (ii) the practice of paying only legitimate claims . . .". UCC Post–Hearing Brief at 56.

The Court disagrees. The use of the Manville Trust experience to predict AWI's future liability is not realistic at this time. Although the procedures implemented by the Manville Trust may indeed make good sense, the Manville Trust is not operating in the tort system—in which any estimation of AWI's future liability must assume that it will operate. *See* Section II.D., *supra*, at 25. And although medical criteria legislation has been passed in some states, there are no universal standards. *See* 5/23/06 PM Tr. 31–32 (Houff).[33] To expect AWI will exit bankruptcy into a world where the Manville Trust's criteria apply universally is not realistic. The Court recognizes that the data gleaned from the Manville Trust is valuable. However, using this data as a benchmark, or

point of comparison, as did Dr. Peterson regarding the propensity to sue, is far different than basing a calculation on the assumption that AWI's experience will exactly replicate that of the Manville Trust.

Combining the forecast malignant and nonmalignant claims, Dr. Chambers reached a total of 189,211 future compensable asbestos personal injury claims against AWI.[34] Chambers Report (UCC Ex. 51) at 43 (Table 22). To calculate an average settlement value, Dr. Chambers calculated the average settlement value AWI paid for claims in each disease category for four years, purportedly 1997–2000. However, instead of using the actual settlement averages for each of the four years, Dr. Chambers calculates the average settlement values for 1997–1999 and applies these numbers to the year 2000.[35] Her average is therefore, the average of the settlement values paid by AWI in 1997–1999, plus the average settlement value of the year 2000, if the settlement values in 2000 had been the average paid in 1997–1999. Chambers Report (UCC Ex. 51) at 18–21. Dr. Chambers' adjustments to the average settlement values of 2000 are based on her assumption that the withdrawal of GAF Corporation, a CCR member, from CCR, upwardly and anomalously impacted average settlement values in 2000 for remaining CCR members. Chambers Report (UCC Ex. 51) at 18–19. Even assuming the year 2000 was anomalous, the Court also received evidence

---

33. Mr. Houff described medical criteria legislation as "an attempt to codify the threshold level for compensatory diseases," explaining that outside of this legislation "there are no standardized medical criteria for when an asbestos related disease, particularly a nonmalignant disease, is present." 5/23/06 PM Tr. 32.

34. In comparison, Dr. Peterson predicted there would be 538, 666 future compensable claims.

35. To complicate matters further, Dr. Chambers actually only applies the average settlement values for 1997–1999 to 2000 in reference to mesothelioma claims, and applies the 1999 average settlement values for lung cancer, other cancer, and nonmalignant claims. Chambers Report (UCC Ex. 51) at 20.

that 1993 was an anomaly because the Georgine injunction was entered, and that 1997 was an anomaly because the Third Circuit vacated the injunction.[36] 6/14/05 *Federal–Mogul* Tr. 64–85 (Hanly). In the record of asbestos litigation, the number of "anomalous" or unusual years approximates that of "normal" years; thus, taking an average of several years minimizes the extremes and discrepancies caused by these variations. Dr. Chambers, though, first adjusts for the perceived anomalies in the year 2000, and then reaches her four year "average" by using the actual settlement values for 1997, 1998, and 1999, and the adjusted settlement value for 2000. The average is not, therefore, an average. The result, the Court notes, is to reduce the settlement value she uses in her calculations from the settlement value that results from a true unadjusted four-year average of the years 1997–2000.

In addition, the Court heard testimony from Myer, a former claims settlement negotiator for CCR, that the departure of GAF from CCR in 2000 did not have the effect on settlement values assumed by Dr. Chambers. In her report, Dr. Chambers stated that the remaining members of the CCR allocated GAF's share amongst themselves when GAF left the CCR. Chambers Report (UCC Ex. 51) at 19. However, Myer testified that the CCR was able to obtain discounts in many settlements following GAF's departure. 5/23/06 AM Tr. 50–52. In addition, an analysis by Dr. Peterson showed that the settlement amounts paid by the CCR in cases where GAF was not named (and on which GAF's withdrawal would therefore have made no difference) increased between 1999 and 2000 almost the same as did the settlement amounts in which GAF was named. 5/24/06 AM Tr. 8–11.

Multiplying the forecast settlement values by the predicted number of future claims, Dr. Chambers reached an estimate of approximately $1.5 billion (using a 2.5% annual inflation rate and a 5.68% discount rate) for AWI's liability for future asbestos personal injury claims. Chambers Report (UCC Ex. 51) at 44. When added to her forecast liability for pending claims, Dr. Chambers reaches a total estimate of $1.96 billion. UCC Post–Hearing Brief at 4.[37]

### D. The Expert Testimony—Similarities and Differences

Although the experts arrive at differing total estimates, there are certain similari-

36. In 1993, AWI and other CCR members filed a class action settlement in the Eastern District of Pennsylvania, seeking to certify a class action by which all future asbestos personal injury claims filed against any CCR member would be resolved pursuant to criteria in the settlement agreement. The district court entered an injunction prohibiting new claims from being filed against AWI and other CCR members. 6/14/05 *Federal–Mogul* Tr. 66 (Hanly); *Georgine v. Amchem Products, Inc.,* 157 F.R.D. 246 (E.D.Pa.1994). The certification of the class was appealed to the Third Circuit, which reversed. *Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3d Cir.1996). In 1997, the Supreme Court affirmed the Third Circuit and vacated the injunction. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

37. Dr. Chambers performed a sensitivity analysis using the entire Nicholson Study population of potential nonmalignant claimants instead of her reduced population. Using the entire Nicholson Study population, Dr. Chambers' estimate increases to $1.984 billion. Chambers Report (UCC Ex. 51) at 46. Dr. Chambers also conducted an additional sensitivity analysis incorporating the assumption that AWI had no liability for labor force entrants after 1957 (except for exposure to one product between 1966 and 1969) because AWI had spun off its insulation business after that date. Under this analysis, Dr. Chambers' estimate decreased to $1.831 billion. Chambers Report (UCC Ex. 51) at 47.

ties between the three analyses. First, each expert finds there to be a similar number of pending asbestos personal injury claims against AWI: Dr. Peterson—141,175 claims, Dr. Florence—141,526 claims, and Dr. Chambers—147,683 claims. Second, in order to calculate the value of future claims, each expert: (a) uses the Nicholson Study or another epidemiological study to project the number of people who will contract asbestos-related malignant disease in the future; (b) makes a "propensity to sue" calculation, which predicts the percentage of people who contract asbestos-related disease who will sue AWI; (c) uses a ratio between predicted future malignant claims and future nonmalignant claims to forecast future nonmalignant claims; and (d) assigns a value to the pending and future claims.

Third, Drs. Peterson, Florence, and Chambers all increase the values they reach by an expected inflation rate—Dr. Peterson uses the actual inflation rate through 2003 and 2.5% after, Dr. Florence used 2.5% to 2006 and 1% thereafter, and Dr. Chambers uses 2.5%. Finally, each expert discounts the nominal values by the agreed-upon discount rate of 5.55%.[38] Finally, each of the experts conducts sensitivity analyses in which they alter their final estimates by incorporating alternate assumptions. *See* Notes 22, 28, 37.

As is apparent not just from the final estimates in the instant case, but in estimation cases in general, "[r]elatively minor variations in underlying assumptions can skew the end result enormously." *Owens Corning*, 322 B.R. at 721. Here, there are several such variations affecting the experts' conclusions. First, in regards to the number of future malignant claims, each

expert began with an epidemiological study—Dr. Peterson with the Nicholson Study, Dr. Florence with the Nicholson Study and the Peto/ARPC method, and Dr. Chambers with the Nicholson Study—and then determined how many of the exposed individuals would be likely to sue. Dr. Chambers, however, then narrowed the Nicholson Study forecast by excluding asbestos exposures that could not be attributed to AWT products, reducing the numbers projected by the Nicholson Study by incorporating information she gleaned from AWI's product history. Chambers Report at 25. As explained above, the Court finds Dr. Chambers' methodology to be less reliable than a straightforward use of the epidemiological studies.

Next, the experts differed as to the ratio of malignant filings to nonmalignant filings to be used to predict the number of future nonmalignant filings. Dr. Peterson took the historic ratio between the number of cancer claims and the number of nonmalignant claims, and forecast a decline in this ratio from its year 2000 level due to changes in the litigation environment. Peterson Report at 40. Dr. Florence used two different methods: (1) using lung cancer claims as an index, he determined the ration of nonmalignant claims filed over four calibration periods, 1996–2000, 1997–2000, 1998–2000, and 1999–2000; and (2) the use of regression models. Florence Report at 17. Dr. Chambers used the ratio experienced by the Manville Trust in the years 2004 and 2005, after the Trust had implemented its revised TDPs. Although the Court believes that the use of an historical ratio is the proper approach, such an approach must account for the fact that the litigation environment has

---

**38.** Although the Plan Opponents state Dr. Chambers uses a discount rate of 5.55%, *see* UCC Post–Hearing Brief at 54, Dr. Chambers' report states that uses a discount rate of 5.68%, the yield on 20–year U.S. Treasury Bonds on the petition date, December 6, 2000. Chambers Report (UCC Ex. 51) at 44.

changed, and that the number of nonmalignant claims filed is declining. This is best reflected by Dr. Peterson's methodology.

Finally, and perhaps most importantly, the experts used different assumptions to reach the average settlement values they incorporated into their calculations. Dr. Peterson took the amount of increase in AWI's settlement averages from 1999 to 2000, and increased the 2000 settlement amounts by that percentage. He then assumed the settlement averages would remain constant going forward into the future, adjusting them only for inflation. Peterson Report at 16. Dr. Florence used AWI's 1999 and 2000 average payments to value pending and future claims, increasing the value by a 2.5% inflation rate through 2006, and a 1% inflation rate thereafter.[39] Florence Report at 21. Dr. Chambers uses an adjusted average settlement value paid by AWI in the years 1997–2000, replacing the actual values paid in 2000 with an average of the years 1997–1999. Chambers Report at 18–21. Although the Court does not find any of the experts' approaches to be completely reliable, it finds Dr. Florence's methodology to be the most persuasive on the issue of settlement values.

## V. The Expert Estimations Offered by the Plan Proponents Are More Persuasive Than That of the Plan Opponents

The Court has thoroughly considered the parties' criticisms of all of the expert analyses, and finds none of the methodologies to be flawless. However, as explained above, the Court need not choose an exact number for AWI's liability in order to confirm or deny confirmation of the Plan. Presented with three estimates of AWI's

pending and future asbestos personal injury liability—$1.9 billion, $4.5 billion, and $6 billion—the Court agrees with the Plan Proponents, and finds that $3.1 billion is a reasonable prediction of the amount of liability AWI will face.

Both the Plan Proponents and the Plan Opponents attempt to correct the other party's expert predictions for what they see as flawed assumptions and methodology. Not surprisingly, each side is able to make the other side's expert prediction approximate their own. The Court will not engage in such calculations. Instead, the Court notes that it has found the expert estimations of the Plan Proponents to be more persuasive, and that Drs. Peterson and Florence adequately incorporate the changed litigation environment into their estimations.

The Court's conclusion should not be construed as the Solomonic choice of a number lying between the estimates—as the Plan Opponents note, such an outcome would be "logically flawed." UCC Post–Trial Brief at 11. A number in the middle of three estimates has no more claim to being right simply for being the mean number than any other number. The Court has looked at the experts' estimations, and has found the estimations of the Plan Proponents' experts to be more reliable and persuasive than that of Dr. Chambers, the Plan Opponents' expert. Even when Dr. Peterson's and Dr. Florence's higher estimates, of $6 billion and $4.5 billion, are corrected for flaws in their methodology or excesses of calculation, $3.1 billion is still a reasonable prediction. And when criticisms of Dr. Chambers' methodology are incorporated, her estimate rises close enough to the $3.1 billion

---

**39.** Dr. Florence states in his report that the "1.0% rate reflects the 2.5% inflation rate reduced by 1.5% to reflect lower claim valua-tions due to the aging of the claimant population." Florence Report at 21.

to, again, demonstrate it to be a reasonable approximation of AWI's present and future liability.

This conclusion is validated by a comparison with estimations made in bankruptcy cases of other major asbestos defendants. In *In re Federal–Mogul*, the court estimated Turner & Newall Limited's liability for pending and future asbestos personal injury claims to be $9 billion. 330 B.R. at 164. Owens Corning's total liability was estimated at $7 billion. *Owens Corning*, 322 B.R. at 725. The *Federal–Mogul* court found that the Owens Corning estimation "was in-line with other major asbestos bankruptcies." 330 B.R. at 156, 156 n. 11.[40]

The estimate is also supported by the experience of other asbestos defendants that had been members of the CCR, and have since emerged from bankruptcy. The Plan Proponents argue that being

part of the CCR *reduced* AWI's liability, while the Plan Opponents contend that AWI will be better able to defend itself as an individual corporation. AWI paid claims while in the CCR for which it may not have had independent liability because the CCR had a policy that each CCR member named in a lawsuit would pay its share of a settlement even if the plaintiff had not provided evidence of exposure as to that member. 5/23/06 AM Tr. 72–73. However, the testimony at the hearing showed that AWI still paid less in the aggregate than it would have outside of the CCR because the defense cost savings and reduced settlement amounts offset the payment of claims AWI may not have paid had it not been in the CCR. 5/23/06 AM Tr. 40, 57–58; 5/23/06 AM Tr. 134–35. For this reason, AWI's liability will increase post bankruptcy now that the CCR is defunct.[41]

**40.** The Plan Opponents point out that the comparison is flawed because AWI was not an asbestos miner or manufacturer, nor a distributor of asbestos products on the scale of other asbestos companies such as Turner & Newall. The point is well-taken, UCC Post–Trial Brief at 18–19. In addition, the Court recognizes that AWI got out of the installation business, which gave rise to its asbestos liability, in 1957. However, as established by the live testimony of Daniel Myer, the claims settlement negotiator for the CCR from 1988 to 2001, and Edward Houff, the primary outside defense counsel for AWI from 1980 until 2000, and the deposition testimony of Lawrence Keating and William Hanlon, regardless of these facts, AWI was a major asbestos defendant before its bankruptcy in 2000. And, although AWI attempted to distinguish between pre–1957 and post–1957 exposure, the issue has never been definitively determined by a court. 5/23/06 PM Tr. 18; 4/24/06 Keating Dep. Tr. 79. Because of the factual nature of the issue and the threat of an adverse ruling, AWI rarely sought resolution of this issue on summary judgment. 5/23/06 AM Tr. 119–20. Although the litigation environment has changed to a certain extent since the 1990s, and in certain situations plaintiffs

have a more substantial hurdle regarding product identification to overcome, AWI, if for no other reason than high name recognition, will almost certainly be again targeted as a major defendant when it emerges from bankruptcy. Regardless of the extent of the changes in the litigation landscape, AWI will continue to face substantial litigation liability. Under these circumstances, it is proper and advisable to compare AWI's liability to that of other major asbestos defendants.

**41.** On the other hand, the Plan Opponents state that the CCR required minimal medical information from claimants to prove their exposure so that it could settle claims quickly. This resulted in an acceptance rate by the CCR of a large majority of claims for payment. Because AWI was named in almost every claim, AWI therefore paid something to settle this large amount of claims. The CCR and AWI were "claims magnets." UCC Post–Hearing Brief at 36; UCC Ex. 50 at 72. According to the Plan Opponents, it therefore stands to reason that AWI will have more success defending itself after its bankruptcy, when it is no longer associated with the CCR.

The post-CCR experience of asbestos defendants who were CCR members shows that

## VI. CONCLUSION

The Court recognizes that the litigation landscape has changed since the 1990s. First, potential asbestos personal injury claimants are an aging population. Second, it is evident that the reform in certain jurisdictions has provided prophylactics to the adjudication of claims of questionable merit. Third, the introduction of more stringent requirements for the evaluation of claims, such as those introduced by the Manville Trust, will also result in a reduction of, at least, the nonmalignant claims. And fourth, the fraudulent claims filing practices described by Judge Jack and others are likely to result in more careful policing of claims by defendants and the courts.

Although the Court recognizes that change has taken place, and that greater change is likely to take place in the future, the extent and direction of the change is not yet fully charted. Given these uncertainties, the Court stands on shifting sands. What may appear reasonable today may well, in a few years, with the benefit of hindsight, turn out to have been incorrect. Nevertheless, the role of the Court is to decide disputes based on the data available as to the present, while making sensible predictions as to the future. It is not to search for mathematical precision, nor ultimate certainty. The Court is not clairvoyant, not the holder of a crystal ball. Rather, it seeks to reach an informed judgment based on an assessment of past experience and current circumstances.

The Court finds, on balance, $3.1 billion to be a reasonable approximation of the debtor's present and future liability for asbestos-related personal injury claims. Thus, the Plan does not discriminate against the UCC, and the UCC's objection is overruled. An appropriate Order follows.

### ORDER

**AND NOW**, this **14th** day of **August 2006**, upon consideration of the Official Committee of Unsecured Creditors' ("UCC") Objection to the Fourth Amended Plan of Reorganization, as Modified, and after a hearing at which counsel for all parties participated, it is hereby **ORDERED** that the objection is **OVERRULED**.

**IT IS FURTHER ORDERED** that counsel for Armstrong World Industries, Inc. shall serve a copy of this Order on all interested parties.

**AND IT IS SO ORDERED.**

settlement amounts increased when the CCR stopped settling claims collectively, effective February 1, 2001. U.S. Gypsum, Union Carbide, T & N, Quigley, and GAF all experienced an increase in settlement amounts post-

CCR. 5/23/06 AM Tr. 55–57 (Myer); Peterson Rebuttal (PS Ex. 58) at 17. The evidence before the Court is that settlement amounts have increased for major asbestos defendants post-CCR.